# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SHAWN LOGAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civ. A. No.  15-499 |
| BD. OF  EDUC. OF SCH. DIST. | ) | |
| OF PITTSBURGH, CITY OF | ) | |
| PITTSBURGH PUB. SCH. DIST., | ) | |
| DALE FREDERICK, RONALD | ) | |
| ZANGARO *and* ROBERT LELLOCK | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION

CONTI, Chief District Judge

## I.    INTRODUCTION

Defendants the Board of Education of the School District of Pittsburgh (the "School Board"), the City of Pittsburgh Public School District (the "School District"), Dale Frederick ("Frederick"), and Ronald Zangaro ("Zangaro") (collectively the "City defendants") filed a motion to dismiss claims asserted against them in the amended complaint in the instant action for failure to state a claim upon which relief can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"). (ECF No. 15.)

This action was filed pursuant to 42 U.S.C. § 1983 ("§ 1983"). Plaintiff Shawn Logan ("plaintiff") alleges defendant Robert Lellock ("Lellock")[1]—a former School

---

[1] Lellock is not a party to this Rule 12(b)(6) motion filed by the City defendants.

District police officer—sexually assaulted him while he was attending a public school operated by the City defendants, in violation of the Fourteenth Amendment Due Process Clause (the "Due Process Clause"). Plaintiff alleges the City defendants failed to prevent Lellock's unlawful conduct, in violation of the Due Process Clause.

## II.  PROCEDURAL HISTORY

On April 15, 2015, plaintiff initiated this action by filing a complaint against the City defendants and Lellock. (ECF No. 1.) On June 9, 2015, plaintiff filed an amended two-count complaint seeking relief under § 1983, alleging: (1) Lellock deprived plaintiff of his due process rights by sexually assaulting him under color of state law; and (2) the City defendants deprived plaintiff of his due process rights under color of state law by acquiescing to a deliberately indifferent custom and failing to train and supervise its employees. (ECF No. 10 at 10–13.)

On June 23, 2015, the City defendants filed a Rule 12(b)(6) motion to dismiss plaintiff's § 1983 claims against them (ECF No. 15) and a brief support.[2] (ECF No. 16.) On July 21, 2015, plaintiff filed a brief in opposition to the City defendants' Rule 12(b)(6) motion to dismiss. (ECF No. 23.) On August 17, 2015, the City defendants filed a reply to plaintiff's brief in opposition to their Rule 12(b)(6) motion. (ECF No. 32.)

On October 7, 2015, the court held a hearing concerning the City defendants' Rule 12(b)(6) motion to dismiss. Because plaintiff failed to allege plausibly that the City defendants caused his constitutional injuries, the court granted the City defendants' Rule 12(b)(6) motion to dismiss. This opinion sets forth in more detail the court's rationale for

---

[2] On June 22, Lellock filed an answer to plaintiff's amended complaint. (ECF No. 14.)

granting the City defendant's Rule 12(b)(6) motion.

## III. ALLEGATIONS IN PLAINTIFF'S AMENDED COMPLAINT

The facts are drawn from plaintiff's amended complaint.[3] *See* (ECF No. 10.) The court accepts as true plaintiff's well-pleaded factual allegations for purposes of the City defendants' Rule 12(b)(6) motion to dismiss.[4] *U.S. Express Lines Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002).

Plaintiff is a twenty-nine-year-old male residing in McKees Rocks, Pennsylvania.

---

[3] Plaintiff attached to his brief in opposition to the City defendants' Rule 12(b)(6) motion to dismiss the 354-page transcript of Lellock's 2013 state criminal trial in the Court of Common Pleas of Allegheny County, Pennsylvania. (ECF No. 23-1.) Plaintiff argues the court should consider testimony in the transcript to corroborate and draw additional inferences from the allegations in his amended complaint. *See* (ECF No. 23 at 12 n.3, 12–14.)

Generally, to the extent the court considers evidence beyond the complaint in deciding a Rule 12(b)(6) motion, it is converted to a motion for summary judgment. *Anjelino v. N.Y. Times Co.*, 200 F.3d 73, 88 (3d Cir. 1999). In resolving this Rule 12(b)(6) motion, the court may look beyond the complaint to matters of public record, including court files and records, documents referenced in the complaint, and documents essential to plaintiff's claims and attached to either plaintiff's complaint or the City defendants' Rule 12(b)(6) motion to dismiss. *Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993). If, however, the court "examines a transcript of a prior proceeding to *find facts*," a motion to dismiss is "convert[ed] into a motion for summary judgment." *Lum v. Bank of Am.*, 361 F.3d 217, 221 n.3 (3d Cir. 2004) (emphasis added) (citing *S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd.*, 181 F.3d 410, 427 n.7 (3d Cir. 1999)).

Because plaintiff asks the court "to find facts" and draw additional inferences from Lellock's criminal trial transcript—*i.e.*, to "judicially notic[e] the truth of facts averred" therein—the court will not consider Lellock's criminal trial transcript in ruling on the City defendants' Rule 12(b)(6) motion to dismiss. *Lum*, 361 F.3d at 221 n.3; *S. Cross Overseas Agencies, Inc.*, 181 F.3d at 427 n.7.

[4] As stated *supra*, note 2, Lellock filed a one-page handwritten answer to plaintiff's amended complaint on June 22, 2015, in which Lellock denied plaintiff's allegations and stated, "I have no money for a lawyer[,] and I am incarcerated. I am not a lawyer so I don't know what the proper response [to plaintiff's amended complaint] I need to give [is]. So I can only say I am innocent." (ECF No. 14.)

(ECF No. 10 at 2.) The School District is a political subdivision in Pittsburgh, Pennsylvania, under which the School Board is duly appointed. (*Id.*) At all times relevant, the School District owned and operated Arthur J. Rooney Middle School (the "Middle School"). (*Id.*) Frederick acted as superintendent and "chief [policymaker]" for the School District and the School District's police department, and Zangaro acted as principal and "chief [policymaker]" for the Middle School. (*Id.*) Lellock served as a police officer for the School District during the timeframe relevant to this action. (*Id.* at 3.) At all times relevant, the City defendants and Lellock "act[ed] under color of [Pennsylvania] law." (*Id.* at 10.)

Plaintiff initially encountered Lellock at age thirteen while preparing to enter sixth grade at the Middle School during the summer of 1998. (*Id.* at 3.) Having recently moved to the neighborhood, plaintiff rode his bike to the Middle School where Lellock offered to give him a tour. (*Id.*) Plaintiff "had a blue stain on his pants from a broken pen," prompting Lellock to request that plaintiff "turn his pockets out, which revealed a credit card." (*Id.*) Lellock "accused [plaintiff] of having stolen the credit card but said that he would cut him a break and not take him to jail." (*Id.*) "On the way out of the [Middle School], . . . Lellock grabbed [plaintiff's] penis . . . and told [plaintiff] that if he told anyone[,] he would 'rip it off.'" (*Id.* at 4.)

Approximately one week into the Middle School's academic year, Lellock "showed up in [plaintiff's] classroom, without authorization, and removed [thirteen-year-old plaintiff] from class." (*Id.*) Lellock took plaintiff "to a locked janitor's room, frisked him, and . . . [asked] him a series of questions about his sexual experiences." (*Id.*) Lellock

"returned [plaintiff] to class . . . but did not physically assault him on that occasion." (*Id.*)
"During this . . . experience[,] . . . Lellock was wearing his police uniform, equipped with
his badge, handcuffs and gun." (*Id.*) Lellock "attempt[ed] to intimidate [plaintiff] into
remaining silent about both this, and future, sexual misconduct." (*Id.*)

"Several days later," Lellock "removed [plaintiff] from a different class . . . and
again took him back to the locked janitor's room, to which he had the key." (*Id.*) "On this
occasion," defendant "once again frisked [plaintiff and] began another . . . discussion
regarding both his own sexual experiences and [plaintiff's] sexual experiences." (*Id.*)
Lellock "pinched the [thirteen-year-old plaintiff's] nipples and told [plaintiff] . . . he was
[Lellock's] 'prison bitch.'" (*Id.*) Lellock "briefly inserted his penis into [plaintiff's]
mouth." (*Id.*)

"Over the course of" the Middle School's academic year, Lellock "continued to
pull [plaintiff] from his [classrooms] . . . on at least [twenty to twenty-five] separate
occasions."[5] (*Id.*) "During these occasions, which lasted up to an hour, . . . Lellock would
take [plaintiff] back to the janitor's room and sexually assault him . . . [by] sticking his
penis in [plaintiff's] mouth, masturbating [plaintiff] while wearing a rubber glove,
making [plaintiff] masturbate . . . Lellock while wearing a rubber glove, and making
[plaintiff] masturbate himself while . . . Lellock stood behind him." (*Id.* at 4–5.) Lellock,
"who was in uniform on all occasions, would often handcuff [plaintiff] in the janitor's
room." (*Id.* at 5.) "The janitor's room in which the assaults occurred was always locked,

---

[5] Later in his amended complaint, plaintiff alleged Lellock removed him from class
"approximately [twenty-five] times." (ECF No. 10 at 5.)

and . . . Lellock would lock the door again, after entry into the room." (*Id.*) "Only . . . Lellock, . . . Zangaro, and one other individual had the key to this room." (*Id.*)

"Never once did any of [plaintiff's] teachers question . . . Lellock as to why he was removing a student from a [classroom], nor did they question either [plaintiff] or . . . Lellock about what . . . transpired when [plaintiff] was returned to class." (*Id.*) Lellock "openly remove[d] children from [Middle School classrooms] for the purposes of sexually assaulting them . . . and grooming them for sexual assault[,] . . . [which] occurred, unchecked, regularly throughout the course of the 1998–99 [Middle School academic] year." (*Id.*) Lellock "routinely engaged in similar conduct with up to twenty-one other boys at [the] Middle School, including taking children out of the [in-school] suspension room . . . to the janitorial closet for extended periods of time." (*Id.*)

Lellock "was not . . . assigned specifically to [the] Middle School," which "had its own security guard." (*Id.*) The Middle School "was merely within the zone to which . . . Lellock was assigned as [a police] officer" for the School District's police department, yet he had "unquestioned, unfettered access to his child victims. . . ." (*Id.* at 6.) Zangaro testified at Lellock's criminal trial that Lellock "was not . . . authorized to remove a child from the classroom," yet "multiple teachers . . . and Zangaro . . . permitted him to do [so] on . . . hundreds of occasions to a number of children exceeding at least [twenty]." (*Id.*) "Despite not being authorized to remove children, not a single teacher stopped [Lellock,] [n]ot a single teacher reported him . . . or even questioned him[,]" and "[n]ot a single teacher made an inquiry to the office" about Lellock's conduct. (*Id.*)

On May 28, 1999, Zangaro "caught" Lellock "in a locked storage room, getting up

from the floor with a student." (*Id.*) Lellock "admitted having taken students [to the locked storage room] in the past" and "expla[ined] . . . he had taken the student in there to wrestle with him." (*Id.*) Lellock "was not terminated for this conduct, . . . though his supervising officer," Robert Fadzen ("Fadzen"), "suggested that [Lellock] should be [terminated]." (*Id.*)

Fadzen "made statements to the press that [Lellock's] 1998–99 assaults 'were just the tip of the iceberg'" and "recommended to . . . Frederick that Lellock should be fired . . . and the matter referred to the Pittsburgh Police Department for an investigation." (*Id.* at 7.) "[N]o police action was undertaken regarding Lellock's conduct," however. (*Id.*) The "'tip of the iceberg' to which . . . Fadzen . . . [referred] is both prior and subsequent incidents of sexual abuse by . . . Lellock at various schools . . . that were ignored by the . . . School District and its various administrators." (*Id.*)

The "May 28, 1999 incident" involving a different Middle School student "was eventually turned over to the City of Pittsburgh Police for investigation, but the investigation was never closed . . . [because] the incident was reported to [the detective responsible for the investigation] as a one-time event, and . . . the victim refused to meet with [the detective]." (*Id.*) Though the School District "already determined . . . Lellock . . . pulled multiple students from class on numerous occasions . . . and had the names of other potential victims . . . and witness statements from the teachers involved, none of the information was turned over to the police." (*Id.*) Fadzen "urged that each of the children [abused by Lellock] be examined by a qualified mental health professional [to] check for signs of abuse," but "[t]hese urgings were ignored." (*Id.* at 7–8.) A "[s]chool

[a]dministrator acknowledged that Lellock's conduct was 'disturbing' . . . [w]hile Lellock was suspended for a short period of time, . . . [but] the School District failed to take meaningful action against [Lellock]"—"a [p]olice [o]fficer [who] was molesting students." (*Id.* at 8.)

Plaintiff "was eventually expelled from [the] Middle School during the 1999 school year"—but prior to the May 28, 1999, incident involving a different student—"for bringing a knife to school . . . for the sole purpose of protecting himself from . . . Lellock, after the system entrusted to protect him failed to do so." (*Id.* at 8–9.) "As a result of his abuse, [plaintiff] suffered severe psychological and emotional harm." (*Id.* at 9.) "[Plaintiff] is . . . unable to have normal sexual relations." (*Id.*) "[Plaintiff] does not like to change the clothing of his own children." (*Id.*) "[Plaintiff] does not feel safe sending his children to school." (*Id.*) "[Plaintiff] cannot tolerate physical contact with other males." (*Id.*) "[Plaintiff] suffers from depression [and] anxiety and has trouble sleeping." (*Id.*) "[Plaintiff] has suffered from substance dependency issues." (*Id.*) "[Plaintiff] has undergone intense psychological counseling in an effort to cope with his experiences, but he will never be free of them." (*Id.*)

"Eventually[,] [plaintiff] took it upon himself to contact the [School District police department]," which "led to . . . [the] investigation and conviction of . . . Lellock." (*Id.* at 9–10.) In July 2013, "Lellock was convicted by a jury of [thirteen] criminal counts, including involuntary deviate sexual intercourse, endangering the welfare of children, indecent assault, corruption of minors[,] and criminal solicitation." (*Id.* at 3.) Lellock was "sentenced to [thirty-two] to [sixty-four] years of incarceration for [his] crimes," and

"[a]ll of his identified victims were children who attended [the Middle School]," including plaintiff. (*Id.*)

## IV. DISCUSSION

In their Rule 12(b)(6) motion to dismiss, the City defendants argue plaintiff's amended complaint fails to allege facts supporting plausible due process § 1983 claims against them. Below, the court sets forth the legal standard for and addresses the merits of the City defendants' Rule 12(b)(6) motion to dismiss.

### A. Rule 12(b)(6) standard

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of the allegations in the complaint. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). In deciding a Rule 12(b)(6) motion to dismiss, the court does not opine whether plaintiff will be likely to prevail on the merits; rather, the court accepts as true all well-pleaded factual allegations in plaintiff's amended complaint and views them in a light most favorable to plaintiff. *U.S. Express Lines Ltd.*, 281 F.3d at 388. While plaintiff's amended complaint need not set forth detailed factual allegations to survive a Rule 12(b)(6) motion to dismiss, it must provide more than labels and conclusions. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A "formulaic recitation of the elements of a cause of action will not do." *Id.* (citing *Papasan v. Allain,* 478 U.S. 265, 286 (1986)). "Factual allegations must be enough to raise a right to relief above the speculative level" and "sufficient to state a claim for relief that is plausible on its face." *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009) (citing *Twombly*, 550 U.S. at 556).

> The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. . . . Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

*Id.* (quoting *Twombly*, 550 U.S. at 556) (internal citations omitted).

Two working principles underlie *Twombly*. *Id.* First, with respect to mere conclusory statements, a court need not accept as true all the allegations contained in a complaint. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). Second, to survive a Rule 12(b)(6) motion to dismiss, a claim must state a plausible claim for relief. *Id.* at 679. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]—that the pleader is entitled to relief.'" *Id.* (quoting FED. R. CIV. P. 8(a)(2)). A court considering a Rule 12(b)(6) motion to dismiss may begin by identifying pleadings that are not entitled to the assumption of truth because they are mere conclusions.

> While legal conclusions can provide the framework of the complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

*Id.*

10

Finally, the court may grant a plaintiff leave to amend a complaint under Federal Rule of Civil Procedure 15 ("Rule 15"), which provides that the court "should freely give leave [to amend] when justice so requires." FED. R. CIV. P. 15. Rule 15, however, does not permit amendment when it would be futile. Futility "'means that the complaint, as amended, would fail to state a claim upon which relief could be granted.'" *Kenny v. United States*, No. 10-4432, 2012 WL 2945683, at *4 (3d Cir. July 19, 2012) (citing *Burch v. Millberg Factors, Inc.*, 662 F.3d 212, 231 (3d Cir. 2011)). "The standard for deciding whether claims are futile for the purpose of granting leave to amend a complaint is the same as a motion to dismiss." *Markert v. PNC Fin. Servs. Grp., Inc.*, 828 F. Supp. 2d 765, 771 (E.D. Pa. 2011). "[I]f the court determines that [the] plaintiff has had multiple opportunities to state a claim but has failed to do so, leave to amend may be denied." *See* 6 CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 1487 (2d ed. 2010).

### B.    Plaintiff's § 1983 claims against the City defendants

In his amended complaint, plaintiff alleged the City defendants "implement[ed] . . . municipal policies and practices that directly violate[d] constitutional rights," "fail[ed] to implement municipal policies to avoid constitutional deprivations," and "fail[ed] to train and supervise employees," all under "color of state law." (ECF No. 10 at 11.) In particular, plaintiff alleged:

> 48.    Upon information and belief, . . . Frederick and . . . Zangaro, as the Superintendent of the [School District] and Principal of [the] Middle School . . . were responsible for supervising . . . Lellock. [Frederick and Zangaro] failed in this responsibility, as is self-evident by the conduct at issue in this litigation, and by the numerous convictions

of . . . Lellock. This is especially so given . . . Lellock's brazen actions toward children in the [School District;] actions that could not have been taken without the acquiescence and/or indifference of . . . Frederick and Zangaro and other . . . School District [policymakers].

49.    Additionally, upon information and belief, [the City defendants] failed to implement appropriate polices and training on a wide variety of subjects, including sexual harassment, sexual misconduct, detention and restraint of students, supervision[,] and discipline. This includes implementing policies and procedures detailing when School District employees could be alone with a child.

50.    It is simply inconceivable that an adult employee would be given the unfettered and unchallenged ability to withdraw multiple students, on multiple occasions, from the classroom, take those students to a locked janitor's closet[,] and sexually assault them for up to an hour, without ever being reported or even questioned, given that the possibility of sexual assaults in schools is common knowledge in the educational community.

51.    In the alternative, if the [City defendants] . . . instituted appropriate policies, they have through gross negligence and carelessness demonstrated deliberate indifference to these policies by failing or intentionally refusing to enforce them.

52.    Furthermore, [plaintiff] alleges, upon information and belief, that the [School District] knew, or should have known, of . . . Lellock's misconduct before his assault on [plaintiff], and failed to take action. Furthermore, [plaintiff] affirmatively alleges that the [School District] . . . learned of . . . Lellock's conduct after [plaintiff's] assault, and further failed to take meaningful action against him, leading [to] the sexual assault of several other children. Both of these actions created a custom and practice of tolerating sexual misconduct by . . . Lellock that enabled him to harm numerous school children. These actions also represent the ratification of illegal conduct by senior [policymakers] of the [School District].

53.    The [School District] is directly responsible for the [c]onstitutional violations[,] both as a result of its policies, customs, and practices, and by virtue of its actions, inactions[,] and ratification of its senior [policymakers].

54.    This conduct on the part of the [City defendants] is actionable under 42 U.S.C. § 1983 because it was taken under the color of state law.

55.    As a direct and proximate result of the unconstitutional acts described [in the amended complaint], [p]laintiff has been irreparably harmed.

(ECF No. 10 at 11–13 ¶¶ 48–55.)

Based upon the contentions in his amended complaint, plaintiff asserted: (1) a deprivation of his due process liberty interest in being free from sexual abuse while attending public school; (2) § 1983 supervisory liability claims against Frederick and Zangaro in their individual capacities; (3) a § 1983 municipal liability claim against the City defendants; and (4) § 1983 claims against the City defendants for failure to train and failure to act.

As set forth on the record and more fully explained below, the court addresses whether plaintiff stated plausible § 1983 claims against the City defendants under Rule 12(b)(6).

## C.    Whether plaintiff stated plausible § 1983 claims against the City defendants

Section 1983 provides, in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights . . . secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

Section 1983 is not "a source of substantive rights" itself but a "method for vindicating federal rights elsewhere conferred by . . . [the] Constitution. . . ." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979).

To state a claim under § 1983, plaintiff must plausibly allege a deprivation of a right secured by the Constitution committed by a "person" acting under color of state law. 42 U.S.C. § 1983; *Nicini v. Morra*, 212 F.3d 798, 806 (3d Cir. 2000); *Iqbal*, 556 U.S. at 679 (citing *Twombly*, 550 U.S. at 556). These requirements are addressed in detail below.

### 1. Whether plaintiff alleged a plausible deprivation of his substantive due process rights

With respect to each of plaintiff's § 1983 claims, the "first step is to identify the exact contours of the underlying [constitutional] right said to have been violated." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998). The second step is to determine whether plaintiff was actually deprived of the alleged constitutional right. *Nicini*, 212 F.3d at 806.

The Due Process Clause protects a public school student's substantive liberty interest in his or her bodily integrity. *Black ex rel. Black v. Ind. Area Sch. Dist.*, 985 F.2d 707, 709 n.1 (3d Cir. 1993) (citing *Ingraham v. Wright*, 430 U.S. 651, 673–74 (1977); *Youngberg v. Romeo*, 457 U.S. 307, 315 (1982)); *see Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 727 (3d Cir. 1989) ("[T]he 'contours' of a student's right to bodily integrity under the Due Process Clause . . . encompass a student's right to be free from sexual assaults by [school staff]."). Sexual assault by a public school staff member deprives a public school student of his or her due process liberty interest in bodily integrity. *Douglas v. Brookville Area Sch. Dist.*, 836 F. Supp. 2d 329, 350 (W.D. Pa. 2011) ("The act of sexually assaulting an individual can *never* further a legitimate

governmental interest." (emphasis in original)); *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 452 (5th Cir. 1994) ("[T]here is never any justification [under the Constitution] for sexually molesting a schoolchild.").

Throughout his amended complaint, plaintiff alleged Lellock—a School District police officer—sexually assaulted him while he was a public school student at the Middle School. *See* (ECF No. 10.) Plaintiff's amended complaint, therefore, alleged facts raising the plausible inference that Lellock deprived him of his due process liberty interest in bodily integrity under color of state law, as required under § 1983 and Rule 12(b)(6). *See Douglas*, 836 F. Supp. 2d at 350; *Twombly*, 550 U.S. at 555 ("Factual allegations must be . . . sufficient to state a claim for relief that is plausible on its face.").

### 2. Plaintiff's § 1983 supervisory liability claims against Frederick and Zangaro in their individual capacities

Plaintiff alleged "Frederick and . . . Zangaro, as the Superintendent of the [School District] and Principal of [the] Middle School . . . were responsible for supervising . . . Lellock" but "failed in this responsibility," rendering them liable in their individual capacities under § 1983. (ECF No. 10 at 11 ¶ 48.) Plaintiff alleged his injury is the "direct and proximate result" of Frederick's and Zangaro's failure to supervise Lellock. (*Id.* at 13 ¶ 55.)

As set forth on the record and more fully explained below, the court addresses the § 1983 supervisory liability framework and whether plaintiff stated plausible § 1983 supervisory liability claims.

### a.   Section 1983 supervisory liability framework

Personal supervisory liability under § 1983 requires plausible allegations that supervisory officials "'participated in violating the plaintiff's rights, directed others to violate them, or, as the person[s] in charge, had knowledge of and acquiesced in [their] subordinates' violations." *Santiago v. Warminster Twp.*, 629 F.3d 121, 129 n.5 (3d Cir. 2010) (quoting *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004)); *McKenna v. City of Phila.*, 582 F.3d 447, 460 (3d Cir. 2009) ("[A] supervisor must have been involved personally, meaning through personal direction or actual knowledge and acquiescence, in the wrongs alleged."). Plaintiff "must identify specific acts or omissions of the supervisor[s] . . . evidenc[ing] deliberate indifference" and prove causation by showing a "relationship between the 'identified deficiency' and the 'ultimate injury.'" *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 216 (3d Cir. 2001) (quoting *Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989)).

### b.   Whether plaintiff alleged plausible § 1983 supervisory liability claims against Zangaro and Frederick

Plaintiff failed to allege facts from which the court can plausibly infer Zangaro and Frederick "had knowledge of and acquiesced in" Lellock's misconduct, such that it caused plaintiff's injury, as required under § 1983 and Rule 12(b)(6). *See Santiago*, 629 F.3d at 129 n.5; *Muhlenberg Twp.*, 269 F.3d at 216. For these reasons, plaintiff's § 1983 supervisory liability claims against Zangaro and Frederick in their individual capacities must be dismissed for failure to state a claim under Rule 12(b)(6).

In his amended complaint, plaintiff alleged that on May 28, 1999—"shortly after

[plaintiff's] abuse" by Lellock—Middle School principal Zangaro "caught" Lellock "in a locked storage room, getting up from the floor with a student." (ECF No. 10 at 6 ¶ 27.) "Lellock admitted having taken students there in the past." (*Id.*) "Lellock's explanation was that he [took] the student [into the locked storage room] to wrestle with him." (*Id.*) "Lellock was not terminated for this conduct," though Lellock's "supervising officer," Fadzen, "suggested . . . he should be [terminated]." (*Id.*) Fadzen "recommended to . . . Frederick that Lellock should be fired" and "the matter referred to the Pittsburgh Police Department for an investigation." (*Id.* at 7 ¶ 28.) "[P]olice action was [not]," however, "undertaken regarding Lellock's conduct." (*Id.*)

The May 28, 1999, incident "was eventually turned over to the City of Pittsburgh Police for investigation, but the investigation was never closed." (*Id.* at 7 ¶ 30.) The "detective responsible for the investigation testified at [Lellock's] criminal proceeding that the incident was reported to her as a one-time event. . . ." (*Id.*) Though the "[School District] . . . already determined" Lellock "pulled multiple students from class on numerous occasions," and despite that it "had the names of other potential victims" and "witness statements from the teachers involved, none of [this] information was turned over to the police." (*Id.*) The detective investigating Lellock "testified [at Lellock's criminal trial] that had this information been turned over, she could have continued with her investigation and potentially closed the case" against him. (*Id.*) "Fadzen urged that each of the children [should] be examined by a qualified mental health professional" to "check for signs of abuse, but [t]hese urgings were ignored." (*Id.* at 7–8 ¶ 31.) In sum, following the May 28, 1999, incident, "Lellock was not terminated despite his

supervisor's recommendation," the "children were not examined by qualified mental health professionals," and the School District "failed to turn over relevant information" to police. (*Id.* at 8 ¶ 32.)

When accepted as true and viewed in a favorable light, *U.S. Express Lines Ltd.*, 281 F.3d at 388, plaintiff's allegations raise the following plausible inferences. Zangaro and Frederick plausibly knew Lellock: (1) took a middle school-aged child into a locked storage closet on public school grounds on May 28, 1999, apparently to "wrestle" with him on the floor; and (2) admitted he took Middle School students from class to the locked storage closet "in the past." A uniformed school police officer purportedly "wrestling" on the floor of a locked closet on school grounds during school hours with a minor child raises the specter of constitutionally violative sexual misconduct, and the City defendants' ultimate decision to report Lellock's conduct to police after the May 28, 1999, incident raises the plausible inference that Zangaro and Frederick believed Lellock's conduct was unlawful. Zangaro plausibly knew about Lellock's May 28, 1999, conduct because he witnessed the incident firsthand. Fredrick plausibly knew about Lellock's May 28, 1999, conduct because Fadzen urged him to submit the incident for police investigation. Notwithstanding the May 28, 1999, incident, Lellock's admissions that he took students to the locked closet in the past, and the City defendants' knowledge of these facts, the City defendants: (1) declined initially to discipline Lellock or submit the matter to police; (2) declined to submit alleged victims to medical examinations for indicia of sexual abuse; (3) reported the May 28, 1999, occurrence to police as a "one-time incident"; and (4) failed to supply police with alleged victims' names and teacher

witness-statements, stalling the investigation into Lellock's misconduct. Lellock was not prosecuted for his conduct until 2012—more than ten years after the May 28, 1999, incident. When viewed in the aggregate and accepted as true, plaintiff's allegations show supervisory conduct or a failure to act that occurred on or after May 28, 1999.

Plaintiff, however, failed to allege plausibly that the City defendants' post-May 28, 1999, failure to respond adequately to Lellock's suspected sexual abuse *caused* the deprivation of plaintiff's due process rights, as required under § 1983 and Rule 12(b)(6). *See Muhlenberg Twp.*, 269 F.3d at 216 (requiring proof of a "relationship between the 'identified deficiency'" in the supervisor's conduct and the claimant's "'ultimate injury'" (quoting *Sample*, 885 F.2d at 1118)). In his amended complaint, plaintiff explicitly alleged Zangaro "caught" Lellock in the locked closet "wrestling" with a student on May 28, 1999—"shortly *after* [plaintiff's] abuse" by Lellock ended. (ECF No. 10 at 6 ¶ 27 (emphasis added)); *see also* (*id.* at 12 ¶ 52) (alleging Zangaro and Frederick "learned [about] . . . Lellock's conduct *after* [plaintiff's] assault, and . . . failed to take meaningful action against [Lellock], leading [to] the sexual assault of several other children" (emphasis added).) Because, as alleged in plaintiff's amended complaint, Zangaro and Frederick did not have notice of Lellock's misconduct until the May 28, 1999, incident— which plaintiff alleged occurred "*after*" Lellock sexually assaulted him—it is implausible to infer that the City defendants' *post*-May 28, 1999, conduct in failing to respond adequately to Lellock's abuse caused plaintiff's *pre*-May 28, 1999, constitutional deprivation by Lellock.

Plaintiff's allegation that his injury is the "direct and proximate result" of

19

Zangaro's and Frederick's inadequate response is conclusory and, therefore, insufficient to show causation under § 1983 and Rule 12(b)(6). *See* (ECF No. 10 at 13 ¶ 55); *Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." (citing *Twombly*, 550 U.S. at 555)). Plaintiff failed to allege any other facts—and his counsel indicated at the October 7, 2015, hearing that plaintiff did not have any other facts—from which the court can plausibly infer Zangaro and Frederick knew about Lellock's misconduct prior to or contemporaneous with the deprivation of plaintiff's due process rights, such that Zangaro and Frederick could have acquiesced to Lellock sexually assaulting plaintiff.[6] Plaintiff, therefore, failed to allege a plausible direct causal link between the City defendants' inadequate response to Lellock's misconduct and the deprivation of plaintiff's constitutional rights, as required under Rule 12(b)(6) and § 1983. *See Muhlenberg Twp.*, 269 F.3d at 216. For these reasons, plaintiff's § 1983 supervisory liability claims against Zangaro and Frederick in their individual capacities must be dismissed under Rule 12(b)(6).

---

[6] Plaintiff alleged Lellock removed plaintiff from class twenty to twenty-five times and removed up to twenty-one other students from class on hundreds of occasions to engage in unlawful sexual misconduct. Plaintiff, however, failed to allege plausibly that Zangaro or Frederick knew about Lellock's misconduct before the May 28, 1999, incident. Plaintiff alleged explicitly, in fact, that unspecified Middle School teachers *did not* apprise Zangaro or Frederick about Lellock's conduct in removing plaintiff and other students from class. Plaintiff's allegations failed to raise the plausible inference that Zangaro and Frederick's inadequate response to Lellock's misconduct after the May 28, 1999, incident caused plaintiff's injuries, as required under § 1983 and Rule 12(b)(6). *See Muhlenberg Twp.*, 269 F.3d at 216; *Iqbal*, 556 U.S. at 679 (requiring a "plausible" claim for relief (citing *Twombly*, 550 U.S. at 555)).

**2.** **Plaintiff's § 1983 municipal liability claim against the City defendants**

Plaintiff alleged a § 1983 municipal liability claim against the City defendants on grounds they "implement[ed] . . . municipal policies and practices that directly violate[d] constitutional rights" and "fail[ed] to implement municipal policies to avoid constitutional deprivations." (ECF No. 10 at 11.) Plaintiff alleged his injury is the "direct and proximate result" of the City defendants' unlawful policies and customs. (*Id.* at 13 ¶ 54.)

As set forth on the record and more fully explained below, the court addresses the § 1983 municipal liability framework and whether plaintiff stated a plausible § 1983 municipal liability claim against the City defendants.

**a.** **Section 1983 municipal liability framework**

"[M]unicipalities and other local government units [are] . . . persons to whom § 1983 applies." *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690 (1978). A municipality cannot, however, be held liable under § 1983 on a *respondeat superior* theory. *Id.* at 691 ("[A] municipality cannot be held liable [under § 1983] *solely* because it employs a tortfeasor." (emphasis in original)); *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011) ("[L]ocal governments are responsible only for 'their *own* illegal acts.'" (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986) (emphasis in original))).

In *Monell*, the Court held

it is [only] when execution of a government's *policy* or *custom*, whether made by its lawmakers or by those whose edicts or acts may fairly be said

to represent official policy, inflicts the injury that the government entity is
responsible under § 1983.

*Id.* at 694 (emphasis added); *McTernan v. City of York*, 564 F.3d 636, 657 (3d Cir. 2009).

*Monell*, therefore, "created a 'two-path track' to [§ 1983] municipal liability, depending

[upon] whether a § 1983 claim is premised [upon] a municipal policy or custom."

*McTernan*, 564 F.3d at 657 (quoting *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir.

1996)).

Under the "policy" path, a local government unit may be "sued directly if it is

alleged to have caused a constitutional tort through 'a policy statement, ordinance,

regulation, or decision officially adopted and promulgated by that body's officers.'" *City*

*of St. Louis v. Praprotnik*, 485 U.S. 112, 121 (1988) (quoting *Monell*, 436 U.S. at 690).

"Policy is made when a 'decisionmaker possess[ing] final authority to establish

municipal policy with respect to the action' issues an official proclamation, policy, or

edict." *Andrews v. City of Phila.*, 895 F.2d 1469, 1480 (3d Cir. 1990) (quoting *Pembaur*,

475 U.S. at 481).

Under the "custom" path, § 1983 authorizes suit "'for constitutional deprivations

visited pursuant to governmental 'custom' even though such a custom has not received

formal approval through the [government] body's official decisionmaking channels.'"

*Praprotnik*, 485 U.S. at 121 (quoting *Monell*, 436 U.S. at 690–91). "A course of conduct

is considered . . . a 'custom' when, though not authorized by law, 'such practices of state

officials [are] so permanent and well settled' as to virtually constitute law." *Andrews*, 895

F.2d at 1480 (quoting *Monell*, 436 U.S. at 690).

In proving either an unlawful policy or custom under § 1983, "it is incumbent upon a plaintiff to show that a policymaker is responsible either for the policy or, through acquiescence, for the custom." *Id.* at 1480–81. Because this case involves Pennsylvania local government entities, the identification of policymaking officials turns on the application of Pennsylvania law. *Praprotnik*, 485 U.S. at 124 ("'Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority, and . . . whether an official had final policymaking authority is a question of state law.'" (quoting *Pembaur*, 475 U.S. at 483)).

Finally, plaintiff must prove the government policy or custom caused the deprivation of his due process rights.

> Once those officials who have the power to make official policy on a particular issue have been identified, it is for the [finder of fact] to determine whether *their* decisions . . . caused the deprivation of rights at issue by policies [that] affirmatively command that it occur, [*see Monell*, 436 U.S. at 661 n.2], or by acquiescence in a longstanding practice or custom [that] constitutes the 'standard operating procedure' of the local governmental entity. [*See Pembaur*, 475 U.S. at 485–87 (White, J., concurring).]

*Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) (emphasis in original). Plaintiff must, therefore, demonstrate that "through its deliberate conduct, the [government entity] was the 'moving force' behind the injury alleged"—*i.e.*, plaintiff must show a "direct causal link between the municipal action and the deprivation of [his] federal rights." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997); *Sanford v. Stiles*, 456 F.3d 298, 314 (3d Cir. 2006).

### b.     **Whether plaintiff stated a plausible § 1983 municipal liability claim**

#### i.     **Policy**

Beyond conclusory allegations, plaintiff failed to assert plausibly the existence or implementation of any "'policy, . . . ordinance, regulation, or decision officially adopted and promulgated by [the City defendants]'" that caused the deprivation of his due process rights. *Praprotnik*, 485 U.S. at 121 (quoting *Monell*, 436 U.S. at 690); *Andrews*, 895 F.2d at 1480 (requiring an "official proclamation . . . or edict" (quoting *Pembaur*, 475 U.S. at 481)). For this reason, the court assesses only whether plaintiff alleged a "custom"-based § 1983 municipal liability claim against the City defendants.

#### ii.     **Custom**

Plaintiff failed to allege facts from which the court can plausibly infer that the City defendants acquiesced in a custom of deliberate indifference to Lellock's sexual abuse that caused the deprivation of plaintiff's due process rights, as required under § 1983 and Rule 12(b)(6). For these reasons, plaintiff's § 1983 municipal liability claim against the City defendants must be dismissed under Rule 12(b)(6).

As a preliminary matter, plaintiff alleged Zangaro and Frederick acted as local government "officials [with] the power to make official policy" with respect to the "particular issue" of sexual misconduct by Middle School and School District staff, as required under § 1983 and Rule 12(b)(6). *Jett*, 491 U.S. at 737; *Andrews*, 895 F.2d at 1480–81 ("[A § 1983] plaintiff [must] show that a policymaker is responsible either for the policy or [custom.]"). Plaintiff alleged Zangaro acted as the "principal of . . . the

[Middle School]" at "all times relevant." (ECF No. 10 at 2 ¶ 7.) Plaintiff alleged Frederick acted as "the superintendent of . . . the School District" of which the Middle School is a part "[a]t all times relevant." (*Id.* at 2 ¶ 6.)

Even if Zangaro and Frederick had power to make official policy, plaintiff failed to allege facts from which the court can plausibly infer the City defendants—through Zangaro and Frederick—"acquiesce[d] in a longstanding . . . custom" of deliberate indifference to "instances of . . . suspected sexual abuse of students" by Lellock that *caused* plaintiff's injuries. *Jett*, 491 U.S. at 737; *Brown*, 520 U.S. at 400; *Stoneking*, 882 F.2d at 725.

As discussed previously with respect to plaintiff's § 1983 supervisory liability claims, plaintiff's allegations concern local government officials' responses to instances of suspected sexual abuse of minor students by Lellock *after* the May 28, 1999, storage closet incident. Like plaintiff's § 1983 supervisory liability claims, plaintiff failed to allege plausibly that the City defendants' post-May 28, 1999, conduct or failure to act caused the deprivation of plaintiff's due process rights, as required under § 1983 and Rule 12(b)(6). *Brown*, 520 U.S. at 404 (requiring a "direct causal link between the municipal action and the deprivation of federal rights"). Plaintiff expressly claimed Zangaro "caught" Lellock in the locked closet "wrestling" with a student on May 28, 1999, "shortly *after* [plaintiff's] abuse" by Lellock ended. (ECF No. 10 at 6 ¶ 27 (emphasis added)); *see also* (*id.* at 11 ¶ 52.) If the City defendants did not have notice of Lellock's misconduct until the May 28, 1999, incident, which occurred "*after*" plaintiff's injury, it is implausible to infer from plaintiff's allegations that the City defendants'

25

conduct or failure to act after May 28, 1999, caused plaintiff's pre-May 28, 1999, injury at the hands of Lellock. As stated, plaintiff's allegation that his injury is the "direct and proximate result" of the City defendants' conduct is conclusory and, thus, insufficient to show causation under § 1983 and Rule 12(b)(6). *See* (ECF No. 10 at 13 ¶ 55); *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Plaintiff failed to allege any other facts from which the court can plausibly infer the City defendants knew about Lellock's misconduct prior to or contemporaneous with the deprivation of plaintiff's due process rights, such that the City defendants could have acquiesced in a custom of deliberate indifference to his constitutional rights. Plaintiff failed to allege a plausible "direct causal link" between the City defendants' alleged inaction and the deprivation of his constitutional rights, as required under Rule 12(b)(6) and § 1983. *See Brown*, 520 U.S. at 404.

For these reasons, plaintiff's § 1983 "custom"-based municipal liability claim against the City defendants must be dismissed under Rule 12(b)(6).

### 3. Plaintiff's § 1983 claims against the City defendants for failure to train and failure to act

Plaintiff alleged the City defendants "failed to implement . . . training on a wide variety of subjects, including sexual harassment, sexual misconduct, detention and restraint of students, supervision[,] and discipline." (ECF No. 10 at 10–11 ¶ 49.) In addition, plaintiff alleged the City defendants "learned [about] . . . Lellock's conduct after [plaintiff's] assault, and . . . failed to take meaningful action against him, leading [to] the sexual assault of several other children." (*Id.* at 11 ¶ 52.) Plaintiff alleged his injury is the

"direct and proximate result" of the City defendants' failure to train its employees and its failure to act after learning about Lellock's conduct. (*Id.* at 13 ¶ 55.)

As set forth on the record and explained in more detail below, the court addresses the § 1983 failure to train and failure to act framework and whether plaintiff stated plausible § 1983 failure to train and failure to act claims against the City defendants.

### a. Section 1983 failure to train and failure to act framework

Section 1983 failure to train and failure to act claims are analyzed together under the same framework. *Berg v. Cnty. of Allegheny*, 219 F.3d 261, 276 (3d Cir. 2000) (applying the "Court's rulings in [failure to train] cases to other [§ 1983] claims of liability through inaction" (citing *Beck*, 89 F.3d at 972; *Williams v. Borough of W. Chester Pa.*, 891 F.2d 458, 467 n.14 (3d Cir. 1989))).

"In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick*, 131 S. Ct. at 1359. Section 1983 failure to train and failure to act claims, however, raise "difficult problems of proof," *Brown*, 520 U.S. at 406, because they are "a step removed from the constitutional violation resulting from that failure."[7] *Douglas*, 836 F. Supp. 2d at 364; *see*

---

[7] In a policy- or custom-based § 1983 claim, government officials *affirmatively* implement policy or agree to customs that *directly* cause the claimant's constitutional deprivation. In a § 1983 failure to train claim, on the other hand, government officials fail to equip *subordinate government actors* with the training necessary to avoid a specific constitutional deprivation, and those subordinates directly cause the claimant's constitutional deprivation. Because government officials' conduct *indirectly* causes the claimant's constitutional deprivation at the hands of an inadequately trained subordinate, § 1983 failure to train claims allege official misconduct "a step removed" from the

*Okla. City v. Tuttle*, 471 U.S. 808, 822 (1985) (plurality opinion) ("[A] 'policy' of 'inadequate training' [is] far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*."). A local government's "culpability for a deprivation of [constitutional] rights is, therefore, at its most tenuous" where a § 1983 claim turns on a failure to train or failure to act. *See Connick*, 131 S. Ct. at 1359.

Because § 1983 failure to train and failure to act claims allege municipal misconduct that is a step removed from the resulting constitutional deprivation, the court must apply a "stringent standard of fault," lest liability "collapse into *respondeat superior*." *Id.* at 1360, 1365; *Brown*, 520 U.S. at 405 (observing that "rigorous standards of culpability and causation must be applied" where a plaintiff alleges a local government "has not directly inflicted an injury" but "caused an employee to do so" through its failure to train or act). Under § 1983, therefore, a "municipality may be liable for the failure to train its employees"—or a failure to act to prevent its employees from violating a citizen's constitutional rights—"only where that failure amounts to 'deliberate indifference to the [constitutional] rights of persons with whom the [employees] come in contact.'" *Doe v. Luzerne Cnty.*, 660 F.3d 169, 179 (3d Cir. 2011) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).

"'[D]eliberate indifference' . . . require[s] proof that a municipal actor disregarded a known or obvious consequence of his [or her] action." *Brown*, 520 U.S. at 410. "[W]hen city policymakers are on actual or constructive notice that a particular omission

claimant's ultimate constitutional injury. *Cf. Douglas*, 836 F. Supp. 2d at 364.

in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." *Connick*, 131 S. Ct. at 1360. The local government's "'policy of inaction' in light of notice that its program will cause constitutional violations 'is the functional equivalent of a decision by the [local government] itself to violate the Constitution.'" *Id.* (quoting *Harris*, 489 U.S. at 395) (O'Connor, J., concurring in part and dissenting in part)); *Pembaur*, 475 U.S. at 483 ("[M]unicipal liability under § 1983 attaches where— and only where—a deliberate choice to follow a course of action is made from among various alternatives by [the relevant] officials. . . .").

"A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of [a] failure to train" claim under § 1983. *Connick*, 131 S. Ct. at 1360 (quoting *Brown*, 520 U.S. at 409). Policymakers' "'continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability.'" *Id.* (quoting *Brown*, 520 U.S. at 407). "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.*

A pattern of constitutional violations is not, however, always necessary to prove a § 1983 failure to train or failure to act claim. In *Harris*, the Court posited that under specific circumstances, the need for training of subordinate municipal actors "can be said

to be 'so obvious' . . . that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights," even without a pattern of constitutional violations. *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 223–24 (3d Cir. 2014) (quoting *Harris*, 489 U.S. at 390 n.10). Liability in such "single-incident cases" depends upon "'[t]he likelihood that the situation will recur and the predictability that an [employee] lacking specific tools to handle that situation will violate citizens' rights.'" *Id.* (quoting *Brown*, 520 U.S. at 409).

Finally, to state either a pattern- or "single-incident"-based § 1983 failure to train or failure to act claim, the claimant must "'prove that the deficiency in training'" or the municipal actors' failure to act "'actually caused [the constitutional violation at issue].'" *Luzerne Cnty.*, 660 F.3d at 170 (quoting *Harris*, 489 U.S. at 391). "In analyzing causation, 'the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform.'" *Thomas*, 749 F.3d at 226 (quoting *Harris*, 489 U.S. at 390). "Liability cannot rest only on a showing that the employees 'could have been better trained or that additional training was available that would have reduced the overall risk of constitutional injury.'" *Id.* (quoting *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1029–30 (3d Cir. 1991)). "Rather, the causation inquiry focuses on whether 'the injury [could] have been avoided had the employee been trained under a program that was not deficient in the identified respect.'" *Id.* (quoting *Harris*, 489 U.S. at 391).

### b.     Whether plaintiff stated plausible § 1983 failure to train and failure to act claims

### i.     Pattern-based failure to train claim

First, plaintiff failed to allege plausibly that the City defendants were "on actual or constructive notice that a particular omission in their training program cause[d]" Lellock to violate plaintiff's due process rights and yet "ch[ose] to retain that [training] program" among "various alternatives," as required to show a pattern-based failure to train or failure to act claim under § 1983 and Rule 12(b)(6). *Connick*, 131 S. Ct. at 1360; *Pembaur*, 475 U.S. at 483.

In his amended complaint, plaintiff alleged the City defendants failed to train Middle School teachers to identify and act upon the risk of sexual abuse inherent in allowing a school police officer to remove plaintiff and up to twenty-one other minor students from their classrooms without authorization on "literally hundreds of occasions" for up to an hour at a time during the 1998–99 Middle School year. (ECF No. 10 at 6 ¶ 25.) Plaintiff, however, failed to allege plausibly that the City defendants knew Lellock removed plaintiff and other students from class without authorization before the May 28, 1999 incident—let alone that the City defendants knew Lellock removed plaintiff and other students from class to engage in constitutionally violative sexual misconduct. In fact, plaintiff alleged explicitly that "not a single teacher . . . reported" to the City defendants that Lellock removed plaintiff or other students from class and "[n]ot a single teacher made an inquiry to the office" about Lellock's conduct. (ECF No. 10 at 6 ¶ 25.) These allegations fail to raise the plausible inference that the City defendants were aware

of a "pattern of similar constitutional violations by untrained [teachers]," as required to demonstrate a "deliberate[ly] indifferen[t]" failure to train or failure to act under § 1983 and Rule 12(b)(6). *Connick*, 131 S. Ct. at 1360 (quoting *Brown*, 520 U.S. at 409); *id.* ("Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights.").

Even assuming, *arguendo*, that plaintiff plausibly alleged a pattern of violations, plaintiff failed to allege plausibly that the City defendants' failure to train or act *caused* plaintiff's injuries at the hands of Lellock. As discussed previously, plaintiff's allegations refer to the City defendants first becoming aware of Lellock's misconduct on or after May 28, 1999—the date on which Zangaro "caught" Lellock allegedly "wrestling" with a Middle School student on the floor of a locked storage closet on school grounds. Plaintiff, however, alleged expressly that the May 28, 1999, incident occurred "shortly *after* [plaintiff's] abuse" by Lellock ended. (ECF No. 10 at 6 ¶ 27 (emphasis added).) Plaintiff's allegations, therefore, failed to raise the plausible inference that the City defendants were "on actual or constructive notice that a particular omission in their training program *cause*[*d*]" Lellock "to violate [plaintiff's] constitutional rights," as required to prove a deliberately indifferent failure to train or act under § 1983 and Rule 12(b)(6). *Connick*, 131 S. Ct. at 1360 (emphasis added).

### ii.    <u>"Single-incident"-based failure to train claim</u>

Second, plaintiff failed to allege plausibly that sexual abuse was the obvious consequence of the City defendants' alleged failure to train its teachers about who was

authorized to remove students from class at the Middle School, as required to prove a "single-incident"-based failure to train or failure to act claim under § 1983 and Rule 12(b)(6). *Thomas*, 749 F.3d at 223–24 (quoting *Harris*, 489 U.S. at 390 n.10).

In his amended complaint, plaintiff alleged unspecified Middle School teachers failed to question or report Lellock for removing students from class on hundreds of occasions without authorization. According to plaintiff, this conduct

> speaks of a failure of training . . . of an unbelievable and conscience[-]shocking level. . . . Every week there is a news story about a teacher or other adult associated with the educational system sexually victimizing a child. *This is a known risk*[;] a risk which responsible school districts protect against. A district cannot assume that every adult in a position to harm children will behave appropriately and not do so. If this were the case, there would be no need for training in the first place. To the contrary, history teaches that these bad actors do exist, and school districts must implement appropriate training to ensure that the risks these individuals pose are minimized. This was the ultimate failure of the [City defendants].

(ECF No. 10 at 6 ¶ 25, 9 ¶ 36 (emphasis added).) In effect, plaintiff alleged the need for the City defendants to train teachers with respect to who could and could not remove students from class was "'so obvious[]' that [their] failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights," even in the absence of a pattern of constitutional violations of which the City defendants were aware. *Thomas*, 749 F.3d at 223–24 (quoting *Harris*, 489 U.S. at 390 n.10).

Plaintiff, however, failed to allege facts from which the court can plausibly infer "single-incident" liability under § 1983 and *Harris*. In *Harris*, the Court offered a hypothetical example of a "single-incident" failure to train claim under § 1983. There, the Court observed that because "city policymakers know to a moral certainty that their

33

police officers will be required to arrest fleeing felons," a decision by those policymakers to provide police officers firearms would render "the need to train officers in the constitutional limitations on the use of deadly force . . . so obvious" that a failure to provide such training could provide a basis for "single-incident" failure to train liability under § 1983. *See Thomas*, 749 F.3d at 223–24 (quoting *Harris*, 489 U.S. at 390 n.10).

Plaintiff's allegations that the City defendants failed to train teachers to detect and report signs of sexual abuse by Lellock do not fall within the factual scenario hypothesized in *Harris*. As stated, "[l]iability in single-incident cases depends on '[t]he likelihood that [a specific] situation will recur and the predictability that *an* [*employee*] lacking specific tools to handle that situation *will violate citizens' rights.*'" *Id.* (quoting *Brown*, 520 U.S. at 409 (emphasis added)). In this case, plaintiff did not allege the City defendants failed to equip teachers with training such that *the teachers* violated plaintiff's due process rights, as hypothesized in *Harris*. Plaintiff alleged the City defendants failed to equip teachers with training such that the teachers allowed *a third-party—i.e.*, Lellock—to violate plaintiff's due process rights. The court is not aware of, and plaintiff failed to point to, any case in which a court extended *Harris*' "single-incident" liability under these attenuated circumstances, in which the claimant's constitutional deprivation at the hands of a third-party is *two* steps[8] removed from the local government's alleged

---

[8] As explained *supra*, note 7, § 1983 failure to train claims seek to impose liability on government officials who *indirectly* cause the claimant's constitutional deprivation at the hands of an inadequately trained subordinate, which renders the official misconduct "[*one*] step removed" from the claimaint's ultimate constitutional injury—*i.e.*, in hypothetical terms, X failed to train Y who injures P.

failure to train its employees to detect and report that deprivation.[9] *Cf. Douglas*, 836 F. Supp. 2d at 364 (noting § 1983 failure to train and act claims raise difficult issues of proof because they are "[*one*] step removed from the constitutional violation resulting from that failure" (emphasis added)); *Jankowski v. Lellock*, Civ. A. No. 13-194, 2013 WL 5945782, at *9 (W.D. Pa. Nov. 6, 2013).

Plaintiff's allegations in support of his "single-incident" § 1983 failure to train and act claims are analogous to those in *Douglas*, in which the court dismissed a § 1983 claim alleging public school officials failed to train employees to "detect and report signs of

---

In this case, however, plaintiff alleges official misconduct *two* steps removed from plaintiff's injury, in that plaintiff claims government officials failed to train teachers who, in turn, failed to stop *a third-party* from directly causing plaintiff's injury—*i.e.*, in hypothetical terms, X failed to train Y *who allowed Z* to hurt P.

[9] During the October 7, 2015, hearing on the City defendants' Rule 12(b)(6) motion to dismiss, plaintiff's counsel cited *Cash v. County of Erie*, 654 F.3d 324, 327 (2d Cir. 2011), in support of plaintiff's § 1983 "single-incident"-based failure to train claim against the City defendants.

*Cash* does not support plaintiff's "single-incident" § 1983 failure to train argument. In *Cash*, a sheriff's deputy sexually assaulted a female prisoner under color of state law while she was incarcerated. *Id.* at 328. In reversing the magistrate judge's grant of the local government's post-trial motion filed under Federal Rule of Civil Procedure 50, the United States Court of Appeals for the Second Circuit found the evidence adduced at trial sufficient as a matter of law to permit a reasonable jury to find that local government officials were deliberately indifferent to the obvious risk of "sexual exploitation posed by *male* [*sheriff's*] *deputies* guarding female prisoners." *Id.* at 335. *Cash*, therefore, falls directly within the hypothetical set forth in *Harris*, in which the Court posited that government officials might be deliberately indifferent to the obvious risk of excessive force posed by *armed police officers* pursuing fleeing felons. *Harris*, 489 U.S. at 390 n.10. Unlike *Cash* and *Harris*, plaintiff in this case alleged the City defendants were deliberately indifferent to the obvious risk of sexual abuse posed by teachers failing to detect and report the allegedly suspicious conduct of *a third-party*, *i.e.*, Lellock. As stated, in the absence of direction from the United States Supreme Court or the United States Court of Appeals of the Third Circuit on this point, the court declines to extend *Harris*' "single-incident" liability under these attenuated circumstances.

sexual abuse" by another employee. *Douglas*, 836 F. Supp. 2d at 356. In so holding, the

court in *Douglas* reasoned that

> [i]n any [§ 1983] failure to train case, the governmental entity's failure to
> provide proper training is a step removed from the constitutional violation
> resulting from that failure. [*Tuttle*, 471 U.S. at 822–23 (plurality opinion).]
> That is why a plaintiff seeking to hold a governmental entity liable in this
> context must demonstrate that his or her injury would have been avoided if
> the *offending employee* had been "trained under a program that was not
> deficient in the identified respect." *Harris*, 489 U.S. at 391. Where a
> plaintiff attempts to extend this theory to a government's failure to train
> *other employees* to detect or report the actions of an offending employee,
> the government's alleged inaction is "a good deal further removed from the
> constitutional violation." *Tuttle*, 471 U.S. at 822. For this reason, it is not
> clear whether such an attenuated [failure to train] claim is ever cognizable
> under § 1983. *Connick*, 131 S. Ct. at 1359 ("In *limited* circumstances, a
> local government's decision not to train certain employees about their legal
> duty to avoid violating citizens' rights may rise to the level of an official
> government policy for purposes of § 1983." (emphasis added)).

*Id.* at 364 (emphasis in original). In the absence of precedent on this point, and in light of

*Connick*'s stringent standard for determining liability in § 1983 failure to train claims,

this court declines to extend *Harris'* "single-incident" framework to the specific

allegations in plaintiff's amended complaint, which assert an "attenuated [failure to train]

claim" *two* steps removed from plaintiff's constitutional deprivation. *Id.*; *Connick*, 131 S.

Ct. at 1359 (providing that "[i]n *limited* circumstances, a local government's decision not

to train certain employees about their legal duty to avoid violating citizens' rights may

rise to the level of an official government policy for purposes of § 1983" and that a local

government's culpability for a deprivation of constitutional rights is "at its most tenuous"

where a § 1983 claim turns on a failure to train (emphasis added)).

For these reasons, plaintiff failed to allege plausible § 1983 failure to train and

failure to act claims against the City defendants, and these claims must be dismissed for failure to state a claim under Rule 12(b)(6).

Plaintiff's counsel requested that plaintiff be given leave to amend his § 1983 failure to train claim to assert factual allegations showing that the need for training would have been so obvious in 1998–1999, that a failure to train claim could be viable. The court granted that request.

## V.    CONCLUSION

For the reasons set forth in this opinion, the City defendants' Rule 12(b)(6) motion will be granted with respect to plaintiff's § 1983 claims against them. Plaintiff may file an amended complaint solely with respect to his § 1983 failure to train claim by November 6, 2015. As noted on the record, amendment of the § 1983 supervisory- and custom-based claims would be futile because there are no facts pre-May 28, 1999, that would have put the City defendants on notice about Lellock's conduct. If plaintiff does not file an amended complaint by November 6, 2015, the court will dismiss all plaintiff's § 1983 claims against the City defendants with prejudice.

An appropriate order will follow.

Dated:        October 14, 2015

/s/ Joy Flowers Conti
Joy Flowers Conti
Chief United States District Judge