**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

SHAWN LOGAN,                )
         Plaintiff,       )
                   )
      **v.**               )       Civ. No.  15-499
                   )
BD. OF EDUC. OF SCH. DIST.  )
OF PITTSBURGH, *et al.*,     )
         Defendants.    )

## OPINION

CONTI, Chief District Judge

## I.    INTRODUCTION

Defendants the Board of Education of the School District of Pittsburgh, the City of Pittsburgh Public School District (the "School District"), Dale Frederick, and Ronald Zangaro ("Zangaro") (collectively, the "City defendants") filed a motion to dismiss the second amended complaint of plaintiff Shawn Logan ("plaintiff") pursuant to Federal Rule of Civil Procedure 12(b)(6). (ECF Nos. 44, 45.) Having been fully briefed and argued, the motion is ripe for disposition.

For the reasons set forth in this opinion, the court will grant the City defendants' Rule 12(b)(6) motion to dismiss without prejudice. If plaintiff seeks to amend the complaint, he must file a motion to amend his complaint pursuant to Federal Rules of Civil Procedure 16(b)(4) and 15(a)(2). *See Graham v. Progressive Direct Ins. Co.*, 271 F.R.D. 112, 118 (W.D. Pa. 2010) (holding that a motion to

amend the complaint after the deadline established by the pretrial scheduling order is analyzed first under Rule 16(b)(4), then Rule 15(a)(2)).

## II.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Because the parties are familiar with this case's factual context and procedural history, the court sets forth only the background information necessary to its analysis.[1]

Pursuant to 42 U.S.C. § 1983 ("§ 1983"), plaintiff alleges: (1) former School District police officer Robert Lellock ("Lellock")[2] sexually assaulted him while he was a public school student at Arthur J. Rooney Middle School (the "Middle School"), in violation of his due process right to bodily integrity; and (2) the City defendants failed to prevent Lellock's misconduct, in violation of plaintiff's right to bodily integrity.

In his first amended complaint, plaintiff alleged § 1983 supervisory liability, municipal liability, failure to act, and failure to train claims against the City defendants. The court granted the City defendants' first Rule 12(b)(6) motion to dismiss all plaintiff's § 1983 claims against them, giving plaintiff leave to amend only his § 1983 "single-incident"-based failure to train claim. (Text Minute Entry,

---

[1] For a more complete factual background, see the record of the October 7, 2015 motions hearing (Text Minute Entry, 10/7/2015), and the court's first Rule 12(b)(6) motion opinion and order. (ECF Nos. 40, 41); *Logan v. Bd. of Educ. of Sch. Dist. of Pittsburgh*, No. 15-499, 2015 WL 5971198 (W.D. Pa. Oct. 14, 2015).

[2] Lellock is not a party to this Rule 12(b)(6) motion.

10/7/2015; ECF Nos. 40, 41.) Specifically, the court stated:

> Plaintiff's counsel requested that plaintiff be given leave to amend his § 1983 failure to train claim [against the City defendants] to assert factual allegations showing that the need for training would have been so obvious in 1998–1999, that a failure to train claim could be viable. The court granted that request.

(ECF No. 40 at 37.)

On November 6, 2015, plaintiff filed a second amended complaint setting forth additional factual allegations in support of his "single-incident"-based § 1983 failure to train claim against the City defendants. (ECF No. 42.) In particular, plaintiff alleges:

- "In the [1990s], it was . . . widely known that school children were at risk of being sexually abused by school personnel. In fact, the United States Department of Education issued guidelines which required all school boards and administrators to adopt appropriate policies, procedures, and training regimens to prevent child abuse and sexual misconduct in schools. In most states, school personnel are mandatory reporters, meaning that they have an affirmative obligation to report suspicions of abuse. Therefore, most school personnel received direct training on how to look for suspicious behavior indicative of sexual misconduct, and to take affirmative steps such as asking questions, to ensure that students are not being victimized." (*Id.* ¶ 34.)

- "As a result, schools across the country promulgated policies and procedures, and implemented training regimens, that assisted school personnel in identifying children who were exhibiting the signs and symptoms of abuse. For example, some of the signs that teachers would be trained to look for included children who were anxious, angry, violent, disruptive, and withdrawn. It was also routine for personnel to be trained to recognize signs that their colleagues were engaging in sexually inappropriate behavior with students. For instance, sexual predators often engage in 'grooming' activities, which are actions taken to form an emotional connection with a child,

and to reduce the child's inhibitions, in order to prepare the children for sexual activity. As a result, school personnel were also trained to recognize grooming behaviors, looking for individuals who gave special attention to certain children and who seek opportunities to spend time alone with children." (*Id.* ¶ 35.)

- "Given what happened to [plaintiff], and numerous other students [at the Middle School], it is clear that the . . . School District failed to enact appropriate policies, procedures, and training regimens to address the known risk of sexual abuse faced by school children in their district. In this case, . . . Lellock was permitted to remove approximately [twenty-one] students, including [plaintiff], from their classrooms on hundreds of occasions. He kept these children out for over an hour on many occasions. . . ." (*Id.* ¶ 36.)

- "[Plaintiff's] teacher also described him as engaging in conduct that was, upon information and belief, consistent with an abused child. Specifically, he was described as disruptive to other students, falling behind, and often absent. Upon information and belief, Lellock's other victims, who were also being repeatedly molested, were also exhibiting similar symptoms associated with an abused child." (*Id.* ¶ 37.)

- "Nevertheless, the teachers at the . . . Middle School never asked . . . Lellock any questions about why he was taking students from the classroom, or where he was going. These teachers also never accompanied the students, or ensured that they would not be alone with . . . Lellock. These teachers also did not ask the students anything about their encounters with . . . Lellock, or follow-up with other administrators." (*Id.* ¶ 38.)

- "Significantly, the alleged purpose of . . . Lellock's removals were [*sic*] often to interview and/or interrogate the students about potential criminal conduct. Not once were the students' parents called to sit in on these interviews, which could have led to potential criminal charges being filed. Nevertheless, multiple teachers, and Zangaro, permitted Lellock to remove students from the classroom on literally hundreds of occasions for a number of different children. This speaks of a failure of training and policy of an unbelievable and conscience shocking level." (*Id.* ¶ 39.)

- "Had . . . [the] School District adopted appropriate policies, procedures, and training regimens regarding the prevention of sexual abuse, Lellock would not have been able to victimize [plaintiff] and other students on so many occasions." (*Id.* ¶ 40.)

- "The foregoing allegations regarding the training and policy regimen of the [School District] are put forward by [plaintiff] after consulting with an expert on school administration." (*Id.* ¶ 41.)

- "Upon information and belief, [the City defendants] failed to implement appropriate policies, procedures, and training regimens on a variety of subjects, including on recognizing signs of child abuse, and/or grooming activities. [The City defendants] also failed to implement appropriate policies, procedures, and training regimens addressing when employees were permitted to be alone with school children." (*Id.* ¶ 52.)

- "The [City defendants] failed to enact such policies and training regimens despite the known risk of the sexual molestation of children in the public schools, by both non-instructional staff and faculty alike." (*Id.* ¶ 53.)

- "A properly trained administration and faculty would have immediately investigated and challenged this conduct, and would have stopped it before children such [as plaintiff] were victimized by a sexual predator [*i.e.*, Lellock]." (*Id.* ¶ 54.)

On November 20, 2015, the City defendants filed this Rule 12(b)(6) motion to dismiss plaintiff's amended "single-incident"-based § 1983 failure to train claim, *i.e.*, the only claim remaining against the City defendants in this action. (ECF Nos. 44, 45.) On December 11, 2015, plaintiff filed a brief in opposition to the City defendants' Rule 12(b)(6) motion to dismiss. (ECF No. 47.)

On January 19, 2016, the court held a hearing at which the parties argued the

City defendants' Rule 12(b)(6) motion to dismiss. *See* (Text Minute Entry, 1/19/2016.) The court took the matter under advisement.

## III.   STANDARD OF REVIEW

The United States Court of Appeals for the Third Circuit recently reiterated the standards the court must apply when deciding a Rule 12(b)(6) motion to dismiss:

> A complaint may be dismissed under Rule 12(b)(6) for "failure to state a claim upon which relief can be granted." But detailed pleading is not generally required. The [Federal Rules of Civil Procedure] demand "only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation and internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*; *see also Sheridan v. NGK Metals Corp.*, 609 F.3d 239, 262 n.27 (3d Cir. 2010). Although the plausibility standard "does not impose a probability requirement," *Twombly*, 550 U.S. at 556, it does require a pleading to show "more than a sheer possibility that a defendant has acted unlawfully," *Iqbal*, 556 U.S. at 678. A complaint that pleads facts "merely consistent with a defendant's liability . . . stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (citation and internal quotation marks omitted).  The plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.
>
> Under the pleading regime established by *Twombly* and *Iqbal*, a court reviewing the sufficiency of a complaint must take three steps. First, it

must "tak[e] note of the elements [the] plaintiff must plead to state a claim." *Iqbal*, 556 U.S. at 675. Second, it should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679; *see also Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 224 (3d Cir. 2011) ("Mere restatements of the elements of a claim are not entitled to the assumption of truth." (citation and editorial marks omitted)). Finally, "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.

*Connelly v. Lane Constr. Corp.*, No. 14-3792, — F.3d —, 2016 WL 106159, at

*3–4 (3d Cir. Jan. 11, 2016).

At the final step of the analysis, the court is to assume the truth of all well-pleaded allegations of "historical fact," construe those allegations in the light most favorable to plaintiff, draw all reasonable inferences from the facts in favor of plaintiff, and ask whether those facts "raise a reasonable expectation that discovery will reveal evidence" to support the legal claim being asserted. *Id.* at *7. Allegations of historical fact are assumed true even if "unrealistic or nonsensical," "chimerical," or "extravagantly fanciful." *Id.* at *6 (citing *Iqbal*, 556 U.S. at 681). "Put another way, *Twombly* and *Iqbal* expressly declined to exclude even outlandish allegations from a presumption of truth except to the extent they resembled a 'formulaic recitation of the elements of a . . . claim' or other legal conclusion." *Id.*

## IV. DISCUSSION

### A. The elements of plaintiff's claims

The court must "'tak[e] note of the elements'" plaintiff must plead to state a § 1983 failure to train claim. *Connelly*, — F.3d at —, 2016 WL 106159, at *3–4 (quoting *Iqbal*, 556 U.S. at 675).

As the court explained in its prior Rule 12(b)(6) opinion in this case, a municipality may be liable for the failure to train its employees "only where that failure amounts to '*deliberate indifference* to the [constitutional] rights of persons with whom the [employees] come in contact.'" *Doe v. Luzerne Cnty.*, 660 F.3d 169, 179 (3d Cir. 2011) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)) (emphasis added). To show the "deliberate indifference" required to state a § 1983 failure to train claim, a claimant may proceed under either a "pattern"- or "single-incident"-based theory of liability.

### 1. "Pattern"-based § 1983 failure to train claim

"A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of [a] failure to train" claim under § 1983. *Connick v. Thompson*, 131 S. Ct. 1350, 1360 (2011) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (1997)). Policymakers' "'continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the

conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability.'" *Id.* (quoting *Brown*, 520 U.S. at 407). "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.*

### 2.    "Single-incident"-based § 1983 failure to train claim

A pattern of constitutional violations is not always necessary to prove a § 1983 failure to train claim. In *Harris*, 489 U.S. at 390, the United States Supreme Court posited that even without a pattern of constitutional violations

> it may happen that in light of the duties assigned to specific . . . employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.

*Id.* There, the Court set forth the following paradigmatic hypothetical of a "single-incident" claim:

> For example, city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force . . . can be said to be "so obvious," that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights.

*Id.* at 390 n.10 (internal citation omitted).

The Third Circuit Court of Appeals has observed that "[l]iability in single-

incident cases depends upon '[t]he likelihood that the situation will recur and the predictability that an [employee] lacking specific tools to handle that situation will violate citizens' rights.'" *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 223–24 (3d Cir. 2014) (quoting *Brown*, 520 U.S. at 409). "To find deliberate indifference from a single-incident violation, the risk of [the] injury [alleged] must be a 'highly predictable consequence' of the [municipality's] failure to provide . . . training." *Id.* at 225 (quoting *Connick*, 131 S. Ct. at 1361).

### 3.    Causation

To state either a "pattern"- or "single-incident"-based § 1983 failure to train claim, the plaintiff must "'prove that the deficiency in training actually caused [the constitutional violation at issue].'" *Doe*, 660 F.3d at 170 (quoting *Harris*, 489 U.S. at 391). "In analyzing causation, 'the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform.'" *Thomas*, 749 F.3d at 226 (quoting *Harris*, 489 U.S. at 390). "[T]he causation inquiry focuses on whether 'the injury [could] have been avoided had the employee been trained under a program that was not deficient in the identified respect.'" *Id.* (quoting *Harris*, 489 U.S. at 391).

### B.    Whether plaintiff states plausible § 1983 failure to train claims

As explained, the court must "identify allegations" related to plaintiff's § 1983 failure to train claims "'that, 'because they are no more than conclusions, are

10

not entitled to the assumption of truth.'" *Connelly*, — F.3d at —, 2016 WL 106159, at *3–4 (quoting *Iqbal*, 556 U.S. at 675). Finally, "[w]hen there are well-pleaded factual allegations," the court "assume[s] their veracity" and "determine[s] whether they plausibly give rise to an entitlement to relief." *Id.* (citing *Iqbal*, 556 U.S. at 679).

### 1. "Pattern"-based § 1983 failure to train claim

At the October 7, 2015 hearing and in plaintiff's response to this Rule 12(b)(6) motion to dismiss, plaintiff acknowledged he cannot state a "pattern"-based § 1983 failure to train claim against the City defendants, as he "does not possess sufficient information to plead" that the City defendants "had knowledge of" Lellock's misconduct "until *after* [plaintiff's] injury." (ECF No. 47 at 9 (emphasis added).) On these grounds, the court dismissed plaintiff's "pattern"-based § 1983 failure to train claim with prejudice at the October 7, 2015 hearing. *See Logan*, 2015 WL 5971198, at *15–16.

For the remainder of this opinion, therefore, the court addresses only whether plaintiff's second amended complaint states a "single-incident"-based § 1983 failure to train claim against the City defendants.

### 2. "Single-incident"-based § 1983 failure to train claim

In support of his "single-incident"-based failure to train claim, plaintiff alleges the City defendants were deliberately indifferent to the need to train staff:

(a) to stop unauthorized personnel (*i.e.*, Lellock) from removing students from Middle School classrooms; and (b) to detect and report signs of sexual abuse of students by Lellock, a School District police officer. The court addresses the plausibility of each of plaintiff's allegations—and (c) the issue of causation—in turn.

<strong>a.    <u>Removal of students from classrooms</u></strong>

In his second amended complaint, plaintiff alleges the City defendants were deliberately indifferent to the need to train staff to identify and stop unauthorized personnel (*i.e.*, Lellock) from removing students (*i.e.*, plaintiff) from Middle School classrooms. In support, plaintiff alleges: (1) Lellock "was not even assigned specifically to [the Middle School]"; and (2) then-Middle School principal Zangaro "testified at [Lellock's] criminal trial that [Lellock] was not even authorized to remove a child from the classroom," yet Lellock did so repeatedly with impunity. (ECF No. 42 ¶¶ 22–23.)

At the January 19, 2016 hearing, plaintiff suggested:

- The City defendants had a policy authorizing only certain employees to remove students from active Middle School classrooms.

- The City defendants, however, did not adequately train Middle School personnel on that removal policy to identify unauthorized employees and stop them from removing Middle School students from class.

- Lellock, a School District police officer, was not authorized to

remove Middle School students from class.

- Because of their inadequate training on the removal policy, Middle School personnel failed to stop Lellock from removing plaintiff from class on numerous occasions.

- Lellock sexually assaulted plaintiff after removing him from class.

- Therefore, the City defendants' failure to train Middle School personnel on the removal policy was the moving force behind Lellock's sexual assault of plaintiff, in violation of plaintiff's constitutional rights.

Critically, however, plaintiff's second amended complaint does not include specific allegations of a student-removal policy applicable to the Middle School and promulgated by the City defendants.

For the reasons that follow, the allegations in plaintiff's second amended complaint fail to raise the plausible inference that "in light of the duties assigned to specific . . . [Middle School] employees," the "need for more or different training" to identify and stop unauthorized personnel, *i.e.*, Lellock, from removing students from class "[was] so obvious," and the "inadequacy so likely to result in" the sexual assault of plaintiff and other students, that the City defendants can "reasonably be said to have been deliberately indifferent to the need" for such training. *Harris*, 489 U.S. at 390.

The court finds *L.R. v. School District of Philadelphia*, 60 F. Supp. 3d 584 (E.D. Pa. 2014), persuasive on this point. There, the district court found allegations of a "single-incident"-based failure to train claim plausible where a public school

teacher released a kindergarten student from class to a woman without verifying the woman's identity or authority to remove the child. *Id.* at 586. Tragically, the woman abducted and sexually assaulted the child. *Id.* at 586–87. The child's parent filed suit against the school district alleging a "single-incident"-based § 1983 failure to train claim. *Id.* at 586, 599–601. In her complaint, the plaintiff in *L.R.* alleged the school district had a policy providing that

- only the "principal or his or her designee, the assistant principal, or the teacher-in-charge" was authorized to "grant a release" of students during the school day;

- any such release had to take place in the "school office"; and

- under "'no circumstances'" was a "'pre-kindergarten through Grade 8 pupil'" to be released without a "'properly identified adult'" or "'the adult's identification [being] checked against school records.'"

*Id.* at 587 (quoting the plaintiff's complaint). The plaintiff in *L.R.* alleged that by enacting such a policy, the school district conveyed its awareness of the likely risk of "'pupil abduction by unidentified individuals'" yet failed to train its employees on that policy, causing the child's constitutional injury. *Id.*

In ruling on the school district's Rule 12(b)(6) motion to dismiss the plaintiff's complaint, the district court in *L.R.* concluded that the plaintiff stated a plausible "single-incident"-based failure to train claim against the school district. *Id.* at 599–601. In so holding, the district court agreed with the plaintiff that by enacting the student-removal policy, the school district conveyed its awareness of

14

the likely risk of abduction in releasing students to unidentified, unauthorized individuals, yet failed to train its staff on that policy, plausibly showing deliberate indifference to the child's rights:

> Just as in [*Harris*' deadly force hypothetical], [the] plaintiff alleges in this case that the [school district] . . . instituted policies that charged only a specific set of officials with vital authority, *i.e.*[,] the authority to release young students during the school day, and failed to train and supervise employees on the exercise of and restrictions on that power. The [plaintiff's complaint] further avers that [the] defendants failed to provide this training and supervision, "[d]espite their awareness of risk of child abduction," the precise risk that was realized in this case. Plaintiff's allegations regarding the [school district's] policies, strictly limiting the circumstances under which young students may be released during the school day, further support a reasonable inference that [the] defendants were aware of the risks involved in releasing students and that the risk of [the child's] injury was a "highly predictable consequence" of [the] defendants' failure to provide training . . . with respect to their release policies.

*Id.* at 600–01.

In summary, the district court in *L.R.* found it plausible to infer that the school district knew students likely would be abducted if it failed to train staff about when, where, why, and to whom students could be released. The district court in *L.R.* reached this conclusion because the plaintiff alleged the school district enacted a student-removal policy specifically to prevent abduction. In light of the policy's specificity in substance and purpose—and allegations in the plaintiff's complaint that the school district failed to train its staff on that policy— the district court in *L.R.* found it plausible to infer deliberate indifference to the

child's constitutional rights.

Unlike *L.R.*, this court cannot plausibly infer that the City defendants knew students likely would be sexually assaulted by a school police officer (*i.e.*, Lellock) if the City defendants failed to train Middle School staff about when, where, why, and to which School-District personnel students could be released from class. While plaintiff's allegations are arguably sufficient to imply negligence, they fail to show the requisite knowledge for this court to plausibly infer deliberate indifference on the part of the City defendants. The court cannot plausibly infer deliberate indifference because plaintiff fails to set forth factual allegations sufficient for this court to infer knowledge; for example, allegations that the City defendants had enacted a student-removal policy to prevent the sexual assault of students by School District personnel, including police officers like Lellock. *Cf. L.R.*, 60 F. Supp. 3d at 600–01.

In *L.R.*, the complaint alleged a specific school-district policy to prevent the abduction of students. As detailed above, although plaintiff argued that a student-removal policy existed in this case, plaintiff did not set forth factual allegations in his second amended complaint to that effect. Instead, plaintiff made only two vague allegations concerning the removal of students from Middle School classrooms by School District personnel, including police officers like Lellock. For related reasons, both of these allegations are insufficient to state a "single-incident"

failure to train claim.

First, plaintiff alleges Lellock "was not even assigned specifically to [the Middle School]," yet he removed students from class with impunity. (ECF No. 42 ¶ 22.) Without supporting factual allegations, however, the court cannot plausibly infer that the City defendants knew that a policy was needed to stop School District police officers from sexually abusing students. Without factual allegations sufficient to imply knowledge, the court cannot plausibly infer that the City defendants knew students could be sexually assaulted if the City defendants failed to train staff to identify and stop School District personnel, including police officers like Lellock, who were not assigned to the Middle School, from removing students from class. While negligence may be inferable, plaintiff's allegation is insufficient for the court to plausibly infer deliberate indifference.

Second, plaintiff alleges then-Middle School principal Zangaro "testified at [Lellock's] criminal trial that [Lellock] was not even authorized to remove a child from the classroom," yet he did so with impunity. (*Id.* ¶ 23.) Again, absent supporting factual allegations, the court cannot plausibly infer that the City defendants knew that sexual abuse of students was likely if School District police officers were permitted to remove students from Middle School classrooms. Without allegations of such knowledge—like, for example, allegations of a policy like the one discussed in *L.R.*—the court cannot plausibly infer that the City

defendants knew students likely would be sexually assaulted if the City defendants failed to train Middle School staff to identify unauthorized police officers and stop them from removing students from class. As the court stated in a similar case:

> "[a] teacher's decision to" permit school police officers to remove students from classrooms "does not inherently threaten the student's welfare." There may be instances where a school police officer has a legitimate reason to take a student out of the classroom. Thus, it cannot be said that sexual abuse of students was the "plainly obvious consequence" of permitting school police officers to remove students from classrooms upon request.

*Jankowski v. Lellock*, No. 13-194, 2013 WL 5945782, at *9 (W.D. Pa. Nov. 6, 2013) (quoting *Douglas v. Brookville Area Sch. Dist.*, 836 F. Supp. 2d 329, 362 (W.D. Pa. 2011)). This allegation, therefore, also fails to raise the plausible inference of deliberate indifference to plaintiff's rights.

For these reasons, plaintiff fails to plausibly allege "single-incident" liability premised upon the need to train staff to identify and stop unauthorized personnel, like Lellock, from removing students from Middle School classrooms.

### b.    Detecting and reporting signs of abuse

Plaintiff alleges the need for the City defendants to train Middle School staff to detect and report signs of sexual abuse of students by School District personnel was so obvious, and the lack of such training so likely to result in sexual abuse, that the City defendants' failure to provide this training was deliberately indifferent to plaintiff's rights. As detailed previously, plaintiff alleges:

- "In the [1990s], it was . . . widely known that school children were at risk of being sexually abused by school personnel. In fact, the United States Department of Education issued guidelines which required all school boards and administrators to adopt appropriate policies, procedures, and training regimens to prevent child abuse and sexual misconduct in schools. In most states, school personnel are mandatory reporters, meaning that they have an affirmative obligation to report suspicions of abuse. Therefore, most school personnel received direct training on how to look for suspicious behavior indicative of sexual misconduct, and to take affirmative steps such as asking questions, to ensure that students are not being victimized." (ECF No. 42 ¶ 34.)

- "As a result, schools across the country promulgated policies and procedures, and implemented training regimens, that assisted school personnel in identifying children who were exhibiting the signs and symptoms of abuse. For example, some of the signs that teachers would be trained to look for included children who were anxious, angry, violent, disruptive, and withdrawn. It was also routine for personnel to be trained to recognize signs that their colleagues were engaging in sexually inappropriate behavior with students. For instance, sexual predators often engage in 'grooming' activities, which are actions taken to form an emotional connection with a child, and to reduce the child's inhibitions, in order to prepare the children for sexual activity. As a result, school personnel were also trained to recognize grooming behaviors, looking for individuals who gave special attention to certain children and who seek opportunities to spend time alone with children." (*Id.* ¶ 35.)

- "Given what happened to [plaintiff], and numerous other students [at the Middle School], it is clear that the . . . School District failed to enact appropriate policies, procedures, and training regimens to address the known risk of sexual abuse faced by school children in their district. . . ." (*Id.* ¶ 36.)

- "[Plaintiff's] teacher also described him as engaging in conduct that was, upon information and belief, consistent with an abused child. Specifically, he was described as disruptive to other students, falling behind, and often absent. Upon information and belief, Lellock's other victims, who were also being repeatedly molested, were also exhibiting similar symptoms associated with an abused child." (*Id.* ¶

37.)

- "The [City defendants] failed to enact . . . policies and training regimens despite the known risk of the sexual molestation of children in the public schools, by both non-instructional staff and faculty alike." (*Id.* ¶ 53.)

Plaintiff's vague allegations fail to raise the plausible inference that the risk of sexual abuse of Middle School students by School District personnel, like Lellock, was "so obvious" to the City defendants in the late-1990s that their failure to provide training to detect and report such abuse was deliberately indifferent to plaintiff's rights. While negligence may be inferable, the court cannot plausibly infer from plaintiff's allegations that the City defendants knew sexual abuse of students by School District personnel, like Lellock, was likely. Plaintiff's second amended complaint lacks plausible allegations of knowledge, such as some official or unofficial policy or action by the City defendants through which they conveyed their awareness of the risk of sexual abuse of Middle School students by School District personnel during the time frame relevant to this case. *Cf. L.R.*, 60 F. Supp. 3d at 600–01 (finding that a school district was deliberately indifferent to the risk of abduction where it conveyed its awareness of that specific risk by enacting a policy protecting against abduction). In the absence of plausible factual allegations that the City defendants "knew to a moral certainty," *Harris*, 489 U.S. at 390 n.10, that sexual abuse of students by School District personnel was a "'highly predictable consequence'" of their failure to train staff to detect and report such

20

abuse, the court can infer only that the City defendants were negligent—not "deliberately indifferent" to plaintiff's rights—in failing to provide such training. *Thomas*, 749 F.3d at 225 (quoting *Connick*, 131 S. Ct. at 1361).

Specifically, plaintiff alleges that "[i]n the [1990s], it was . . . widely known that school children were at risk of being sexually abused by school personnel." (ECF No. 42 ¶ 34.) Without supporting facts, this generalized allegation fails to provide information from which the court can infer matters such as if, how, and why sexual assault of students by school staff was a "widely[-]known" risk *specifically to the City defendants* during the time frame relevant to this case. This generalized allegation may support an inference of negligence on the part of the City defendants—but it does not plausibly support an inference of "deliberate indifference" to plaintiff's rights in failing to train staff to detect and report signs of sexual abuse.

Plaintiff alleges "the United States Department of Education issued guidelines [that] required all school boards and administrators to adopt appropriate policies, procedures, and training regimens to prevent child abuse and sexual misconduct in schools." (ECF No. 42 ¶ 34.) Plaintiff, however, fails to set forth allegations identifying or explaining the "guidelines" to which he refers. Consequently, the court must speculate whether these guidelines applied during the late-1990s to the City defendants, the Middle School, and the alleged misconduct

at issue in this case, and whether the City defendants knew about the guidelines yet failed to act. Without supporting factual allegations, the court cannot plausibly infer that the risk of sexual abuse of Middle School students by School District personnel, like Lellock, was "so obvious" to the City defendants so as to rise to the level of "deliberate indifference" to plaintiff's rights merely because sexual-abuse guidelines were promulgated. *Iqbal*, 556 U.S. at 678 (observing that factual allegations must "permit the court to infer more than the mere possibility of misconduct"). This allegation plausibly supports an inference of negligence; it does not, however, plausibly support an inference of deliberate indifference to plaintiff's rights, as required. *Doe*, 660 F.3d at 179 (quoting *Harris*, 489 U.S. at 388).

Plaintiff alleges that "[*i*]*n most states*, school personnel are mandatory reporters" with an "affirmative obligation to report suspicions of [child] abuse." (ECF No. 42 ¶ 34 (emphasis added).) Plaintiff, however, fails to allege that these "affirmative obligation[s]" applied to the City defendants and Middle School staff in Pennsylvania during the time frame relevant to this case. Without allegations of this nature, the court cannot plausibly infer that the risk of sexual abuse of Middle School students by School District personnel, like Lellock, was "so obvious" to the City defendants in the late-1990s so as to rise to the level of "deliberate indifference" to plaintiff's rights merely because "most states" enforce, or enforced, mandatory child-abuse reporting laws. *Iqbal*, 556 U.S. at 678 (observing

that the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully"). This allegation plausibly supports an inference of negligence, not deliberate indifference to plaintiff's rights, as required. *Doe*, 660 F.3d at 179 (quoting *Harris*, 489 U.S. at 388).

Plaintiff alleges that "[g]iven what happened to [him], and numerous other students,[3] it is clear that [the City defendants] failed to enact appropriate policies, procedures, and training regimens to address the known risk of sexual abuse faced by school children in their district." (ECF No. 42 at ¶ 36.) Plaintiff also alleges "schools across the country promulgated policies and procedures, and implemented training regimens, that assisted school personnel in identifying children who were exhibiting the signs and symptoms of abuse." (ECF No. 42 ¶ 35.) Plaintiff, however, fails to allege that the City defendants knew about these policies, procedures, and training regimens during the late-1990s, yet failed to take action to implement similar measures under circumstances demonstrating deliberate indifference to plaintiff's rights. In the absence of such allegations, the court cannot plausibly infer that the risk of sexual abuse of Middle School students by school staff, like Lellock, was "so obvious" to the City defendants merely because "schools across the country" implemented certain policies, procedures, and training

---

[3] Allegations concerning Lellock's abuse of other Middle School students after May 1999 must be separated from allegations concerning Lellock's abuse of plaintiff before May 1999.

regimens. *Iqbal*, 556 U.S. at 678 (observing that the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully"). Again, this allegation may show negligence, but it does not plausibly show "deliberate indifference" to plaintiff's rights, as required. *Doe*, 660 F.3d at 179 (quoting *Harris*, 489 U.S. at 388).

For the reasons discussed above, plaintiff fails to plausibly allege a "single-incident"-based failure to train claim premised upon the need to train staff to detect and report signs of sexual abuse of plaintiff by Lellock.

### c. Causation

As stated previously, the plaintiff must allege facts from which the court can plausibly infer that the "'deficiency in training *actually caused*'" the constitutional violation at issue. *Doe*, 660 F.3d at 170 (quoting *Harris*, 489 U.S. at 391) (emphasis added).

While not dispositive to this Rule 12(b)(6) motion to dismiss, plaintiff's amended "single-incident"-based § 1983 failure to train claim suffers from the same causation deficiency the court identified in its prior Rule 12(b)(6) opinion— *i.e.*, plaintiff alleges official misconduct *two* causal steps removed from the constitutional injury in issue. The court explains this issue in greater detail.

In its prior Rule 12(b)(6) opinion, this court observed that

[a] pattern of constitutional violations is not . . . always necessary to prove a § 1983 failure to train claim. In *Harris*, the United States

24

> Supreme Court posited that under *specific circumstances*, the need for training of subordinate municipal actors "can be said to be 'so obvious' . . . that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights," even without a pattern of constitutional violations. [*Thomas*, 749 F.3d at 223–24 (quoting *Harris*, 489 U.S. at 390 n.10)].

*Logan*, 2015 WL 5971198, at *15 (emphasis added). The court recognized, however, that the typical § 1983 failure to train claim (including a "single-incident"-based claim) raises "'difficult problems of proof'" because it alleges official misconduct "'[*one* causal] step removed from the constitutional violation resulting from that failure [to train].'" *Id.* at *14 (quoting *Brown*, 520 U.S. at 406; *Douglas*, 836 F. Supp. 2d at 364). The following comparison between a general § 1983 *Monell*[4] claim and a failure to train claim illustrates the difficulty of proving that a policymaker's failure to train caused a constitutional violation.

In the archetypal § 1983 *Monell* claim, government policymakers affirmatively implement policies or tacitly acquiesce to customs that *directly* cause the claimant's constitutional deprivation. In hypothetical terms, policymaker-"X" *directly* deprives citizen-"C" of her constitutional rights via a government policy or custom. In the archetypal *Monell* claim, therefore, there are no additional causal links between the policymaker's misconduct and the constitutional injury alleged; the policymaker directly causes the injury.

In the archetypal § 1983 failure to train claim, on the other hand,

---

[4] *See Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690 (1978).

policymakers fail to equip *subordinate government actors* with the training necessary to avoid specific constitutional deprivations, and *those subordinates* directly cause the citizen's constitutional injury. In hypothetical terms, policymaker-"X" fails to train subordinate-"Y" who directly injures citizen-"C" as a result of the policymaker's failure to train. Because the policymaker's failure to train the subordinate *indirectly* causes the citizen's constitutional deprivation at the hands of that subordinate, the archetypal § 1983 failure to train claim renders the policymaker liable for official misconduct "[*one* causal] step removed" from the claimant's constitutional injury. *Douglas*, 836 F. Supp. 2d at 364. Because of this additional causal step between the policymaker's misconduct (*i.e.*, the failure to train) and the constitutional injury alleged, "difficult problems of pro[ving]" that the official misconduct *actually caused* the injury arise.[5] *Brown*, 520 U.S. at 406.

_____

[5] In *Brown*, the United States Supreme Court explained:

> Claims not involving an allegation that the municipal action itself violated federal law, or directed or authorized the deprivation of federal rights, [*i.e.*, failure to train claims,] present much more difficult problems of proof. That a plaintiff has suffered a deprivation of federal rights at the hands of a municipal employee will not alone permit an inference of municipal culpability and causation; the plaintiff will simply have shown that the *employee* acted culpably.

*Brown*, 520 U.S. at 406–07 (emphasis in original). In *Tuttle*, a plurality of the Court observed:

> To establish the constitutional violation in *Monell* no evidence was needed other than a statement of the policy by the municipal

Because of this *single* causal step, the Court has repeatedly expressed that a local

government's "culpability for a deprivation of [constitutional] rights is . . . *at its*

*most tenuous*" where a § 1983 claim turns on a failure to train. *Connick*, 131 S. Ct.

at 1359 (stating courts must apply a "stringent standard of fault" when assessing §

1983 failure to train claims, lest liability "collapse into *respondeat superior*")

(emphasis added); *Brown*, 520 U.S. at 405 (observing that "rigorous standards of

culpability and causation must be applied" where a plaintiff alleges a local

> corporation, and its exercise; but the type of "policy" [of a failure to
> train] upon which respondent relies, and its causal relation to the
> alleged constitutional violation, are not susceptible to such easy proof.
> In the first place, the word "policy" generally implies a course of
> action consciously chosen from among various alternatives; it is
> therefore difficult in one sense even to accept the submission that
> someone pursues a "policy" of "inadequate training," unless evidence
> be adduced which proves that the inadequacies resulted from
> conscious choice—that is, proof that the policymakers deliberately
> chose a training program which would prove inadequate. And in the
> second place, some limitation must be placed on establishing
> municipal liability through policies that are not themselves
> unconstitutional, or the test set out in *Monell* will become a dead
> letter. Obviously, if one retreats far enough from a constitutional
> violation some municipal "policy" can be identified behind almost
> any such harm inflicted by a municipal official; for example, [the
> subordinate government actor in *Tuttle*] would never have killed
> Tuttle if Oklahoma City did not have a "policy" of establishing a
> police force. But *Monell* must be taken to require proof of a city
> policy different in kind from this latter example before a claim can be
> sent to a jury on the theory that a particular violation was "caused" by
> the municipal "policy." At the very least there must be an affirmative
> link between the policy and the particular constitutional violation
> alleged.

*City of Oklahoma City v. Tuttle*, 471 U.S. 808, 822–23 (1985) (plurality opinion).

government "has not directly inflicted an injury" but "caused an employee to do so" through its failure to train); *Tuttle*, 471 U.S. at 822 (plurality opinion) (observing that a "policy" of "inadequate training" is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*.").

Factually, a "single-incident"-based § 1983 failure to train claim falls within the "one-causal-step" failure to train archetype. As this court explained previously, the Court offered

> a hypothetical example of a "single-incident" failure to train claim under § 1983 [in *Harris*]. There, the Court observed that because "city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons," a decision by those policymakers to provide police officers firearms would render "the need to train officers in the constitutional limitations on the use of deadly force . . . so obvious" that a failure to provide such training could provide a basis for "single-incident" failure to train liability under § 1983. *See Thomas*, 749 F.3d at 223–24 (quoting *Harris*, 489 U.S. at 390 n.10).

*Logan*, 2015 WL 5971198, at *17. In *Harris'* hypothetical, the policymaker fails to train the armed police officer (*i.e.*, the subordinate) in the use of deadly force, and the *police officer* directly deprives the fleeing felon (*i.e.*, the citizen) of his or her constitutional right. A "single-incident" claim stemming from *Harris'* hypothetical, therefore, alleges government misconduct *one* causal step removed from the constitutional injury in issue. While the Court in *Harris* posited that it is "obvious" policymakers must train armed police officers in the use of deadly force,

this expansive language must be read in context with the narrow facts of *Harris'* "single-incident" hypothetical.

In this case, plaintiff's allegations extend beyond the facts of *Harris'* "single-incident" hypothetical to allege official misconduct through a failure to train *two* causal steps removed from the constitutional violation in issue. Specifically, plaintiff alleges the City defendants failed to train their teachers to detect, report, and prevent Lellock from sexually abusing Middle School students, including plaintiff. In hypothetical terms, therefore, plaintiff alleges policymakers (*i.e.*, the City defendants) failed to train subordinates (*i.e.*, teachers) to prevent a *third-party* (*i.e.*, Lellock) from directly injuring a citizen (*i.e.*, plaintiff). Such a theory attenuates further the already-attenuated causal chain between the policymaker's misconduct and the injury at issue in a failure to train claim. Given the Court's stringent standards of culpability and causation for failure to train claims alleging official misconduct merely *one* causal step removed from the injury, this court expresses doubt whether "single-incident" liability may be extended to failure to train claims alleging official misconduct *two* causal steps removed from the injury. *Cf. Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 670 (D.C. Cir. 1996) ("The greater number of uncertain links in a causal chain, the less likely it is that the entire chain will hold true.").

This court could not locate, and plaintiff (again) failed to point to, any

binding authority extending *Harris'* "single-incident" liability in the attenuated circumstances at issue in this case.[6] Other decisions express similar skepticism whether such an attenuated failure to train claim is ever cognizable under § 1983.[7] In light of the Court's stringent standard for determining liability in "one-causal-step" § 1983 failure to train claims, this court reiterates its doubt whether *Harris'*

---

[6] Plaintiff cites to the district court's decision in *L.R.*, 60 F. Supp. 3d 584, which arguably extended *Harris'* "single incident" framework to a failure to train claim alleging official misconduct two steps removed from the injury at issue. As explained above, the plaintiff in *L.R.* alleged that policymakers failed to train a subordinate who allowed a third-party to remove a child from school, resulting in injury. The district court in *L.R.*, however, did not address the issue of causation raised by this court in this case. *See id.* at 600 (concluding without explanation that the "plaintiff has satisfied the causation element of her ["single-incident" failure to train] claim"). *L.R.* is, therefore, not persuasive on the issue of causation in "single-incident" § 1983 failure to train claims.

[7] *See M.S. ex rel. Hall v. Susquehanna Twp. Sch. Dist.*, 43 F. Supp. 3d 412, 425 (M.D. Pa. 2014) ("[A] failure to train teachers to identify and report sexual harassment is not *per se* deliberate indifference."); *Jankowski*, 2013 WL 5945782, at *7 n.5 ("[The plaintiff's] claim is based not on a failure-to-train Lellock, the actor actually responsible for the alleged violation of [the plaintiff's] constitutional rights, as is usually true in these types of cases. Instead, [the plaintiff] has attempted to expand this theory to the School District's failure to train other employees to detect and report abuse. This [c]ourt has previously expressed skepticism about . . . such an attenuated failure-to-train claim. . . ." (internal quotation marks omitted)); *Douglas*, 836 F. Supp. 2d 329, 356, 364 (W.D. Pa. 2011) ("[I]t is not clear whether such an attenuated [failure to train] claim is ever cognizable under § 1983."); *cf. Kline ex rel. Arndt v. Mansfield*, 255 F. App'x 624, 629–30 (3d Cir. 2007) ("[The plaintiff] asserts that [the school district] failed to properly train its employees to spot and report signs of sexual abuse [perpetrated by another school employee]. . . . [B]ecause not committing the crime of sexually abusing a child is obvious, the failure of [the school district] to train its employees to spot signs of sexual abuse such as [a teacher-perpetrator's] 'grooming' methods was not deliberately indifferent.").

"single-incident" framework extends to failure to train claims alleging official misconduct *two* causal steps removed from the injury.

## V.   CONCLUSION

For the reasons set forth in this opinion, the court will grant the City defendants' Rule 12(b)(6) motion to dismiss plaintiff's § 1983 "single-incident"-based failure to train claim—*i.e.*, the only claim remaining against the City defendants in plaintiff's second amended complaint—without prejudice.

If plaintiff seeks to amend the complaint, he must file a motion to do so. If plaintiff fails to file a motion to amend the complaint within ninety days from the issuance of this opinion and accompanying order, the court will dismiss plaintiff's "single-incident"-based § 1983 failure to train claim against the City defendants with prejudice.

An appropriate order follows.


DATED:      February 8, 2016

/S/ JOY FLOWERS CONTI
Joy Flowers Conti
Chief United States District Judge
