**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| SHAWN LOGAN, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 15-499 |
| | ) | |
| BD. OF EDUC. OF SCH. DIST. | ) | |
| OF PITTSBURGH, *et al.*, | ) | |
| Defendants. | ) | |

## OPINION

CONTI, Chief District Judge

### I.       INTRODUCTION

Plaintiff Shawn Logan ("Logan") seeks justice for sexual abuse he endured as a sixth grader from Robert Lellock ("Lellock"), a school police officer, the City of Pittsburgh Public School District ("District"), and the Board of Education of the School District of Pittsburgh (the "Board" and together with the District, the "City defendants"). On December 12, 2016, the court granted summary judgment in favor of Logan and against Lellock on liability. (ECF No. 82). Logan is seeking to file a second amended complaint to bring claims against the City defendants under 42 U.S.C. § 1983 for failing to train their employees on: (1) the proper circumstances in which District police officers may remove a child from class; and (2) detecting and reporting sexual abuse of schoolchildren. (ECF No. 59).

The parties engaged in extensive motions practice in this case. Logan filed the instant motion for leave to amend his complaint (ECF No. 59) under Federal Rules of Civil Procedure 16(b)(4) and 15(a)(2). The City defendants filed a brief in opposition. (ECF No. 69). The motion is fully briefed (ECF Nos. 60, 69) and ripe for disposition. Because Logan's complaint does not allege facts from which the court can reasonably infer that the City defendants were

deliberately indifferent to the risk that Lellock would sexually abuse him upon removing him from class, the court must deny Logan's motion.

## II.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The parties are familiar with the facts regarding the horrendous sexual abuse that Logan suffered by the conduct of Lellock, a former District police officer, at Rooney Middle School ("Rooney M.S.") during Logan's sixth-grade school year.[1] Lellock, on numerous occasions, removed Logan from his classroom, took him to a janitor's closet, and sexually abused him. Lellock was convicted in 2013 in state court of crimes against Logan, including involuntary-deviate-sexual intercourse, endangering the welfare of children, corruption of minors, indecent assault, and criminal solicitation. (ECF No. 58-1 at 2–6).

The City defendants became aware of inappropriate conduct by Lellock at Rooney M.S. on May 28, 1999, when Rooney M.S. principal Ronald Zangaro ("Zangaro") discovered Lellock with a student in an otherwise unoccupied room. (ECF No. 59-20 ¶ 28). Lellock explained that he brought the student to the room to wrestle with him. (*Id.*).

This motion is the third time Logan is seeking to bring claims against the District and the Board in this case. With respect to the City defendants, Logan in his original complaint and first amended complaint alleged that the City defendants implemented policies or practices (or, in the alternative, failed to do so) that directly violated Logan's constitutional rights and they failed to adequately train their employees. (ECF Nos. 1 at 11; 10 at 11). During the first round of motion practice, the court granted the City defendants' Rule 12(b)(6) motion with prejudice with respect to Logan's § 1983 supervisory and custom-based claims against the City defendants. *Logan v.*

---

[1] The court's first opinion in this case, *Logan v. Board of Education of School District of Pittsburgh*, No. 15-499, 2015 WL 5971198, at *1–4 (W.D. Pa. Oct. 14, 2015), contains a more detailed account of Logan's factual allegations.

*Bd. of Educ. of Sch. Dist. of Pittsburgh*, No. 15-499, 2015 WL 5971198, at \*19 (W.D. Pa. Oct. 14, 2015). The court allowed Logan to amend his complaint to include sufficient factual allegations to support his failure-to-train claims against the City defendants. *Id.* Logan's claims against the City defendants in his first amended complaint focused on the District's alleged failure to train its teachers on recognizing signs of child abuse and sexual grooming activities toward children. (ECF No. 42 ¶¶ 52–58). With respect to the first amended complaint, the court granted another Rule 12(b)(6) motion filed by the City defendants for failure to state a claim. *Logan v. Bd. of Educ. of Sch. Dist. of Pittsburgh*, No. 15-499, 2016 WL 463787, at \*1 (W.D. Pa. Feb. 8, 2016) [hereinafter *Logan II*]. The court afforded Logan another chance to state a plausible single-incident, failure-to-train claim, provided that he moved to amend his complaint pursuant to Rules 16(b)(4) and 15(a)(2). *Id.* Logan so moved. (ECF No. 59).[2]

After the second motion to dismiss was granted, Logan obtained new evidence regarding the District's alleged failure to train its staff about: (1) when District police could remove students from classrooms and (2) how to detect and report sexual abuse of children. This evidence was obtained during discovery with respect to Logan's claim against Lellock for violation of his substantive due process rights. (ECF No. 42 ¶¶ 45–50). One deposition taken in March 2016 is pertinent to the instant motion. (ECF Nos. 59-1).

In a deposition attached as an exhibit to the proposed second amended complaint, former District police chief Robert Fadzen Jr. ("Fadzen") testified that the District required school police officers to have a warrant for a child's arrest before removing a child from a classroom.[3]

_____

[2] Logan attempts to resurrect his pattern-based § 1983 claims against the City defendants in his latest brief. (ECF No. 60 at 9). The pattern-based claims were dismissed with prejudice during an October 7, 2015 hearing. *Logan II*, 2016 WL 463787 at \*5.

[3] Fadzen's testimony on the proper circumstances that a child could be removed from class is: "Q: [A] police officer should not take a child out of a classroom unless they had a warrant for

(ECF No. 59-1 at 63). He also stated that if the District police wanted to interview a child, the child would be removed from class and brought to the principal's office. (*Id.*). Once there, either a parent or a school district employee would be entitled to observe the child's interview. (*Id.* at 64).

After the Fadzen deposition and obtaining other evidence, Logan drafted the proposed second amended complaint. (ECF No. 59-20). Logan added the following paragraphs[4] in his proposed second amended complaint in an effort to state a claim for which relief could be granted.

> 24. This policy and practice [of not allowing officers to remove students from classrooms without a warrant or authorization] was confirmed by the testimony of the former Pittsburgh Public Schools Chief of Police, Robert Fa[dz]en, who stated that Pittsburgh Public Schools Police Officers were not allowed to remove students from a class room unless they had a warrant or had authorization from the building principal. Furthermore, the Pittsburgh Public Schools required a parent to be present during the interview. These interviews were required to be performed in the office of the building principal or a guidance counselor.

> 25. The purpose of this policy and practice was to preclude unsupervised or unmonitored encounters between students, non-instructional staff and/or visitors, in part to protect them from the risk of sexual abuse. The existence of this policy confirms that the Pittsburgh Public Schools were well aware of the risks of harm

them? A: Correct." (ECF No. 59-1 at 63:14–16). According to Fadzen, this was a written policy in the "Code of Student Handbook." (*Id.* at 64:9). The City defendants contend that they produced a Code of Student Conduct to Logan, but that it does not contain a "policy or procedure relative to a school police officer pulling a student from class." (ECF No. 69 at 7).

[4] Facts and allegations contained in these paragraphs are accepted as true under the Rule 12(b)(6) standard of review, which is used to determine whether it would be futile for Logan to amend his complaint under Rule 15(a)(2). *U.S. Express Lines Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002); *Lorenz v. CSX Corp.*, 1 F.3d 1406, 1413 (3d Cir. 1993); *Markert v. PNC Fin. Servs. Grp., Inc.*, 828 F. Supp. 2d 765, 771 (E.D. Pa. 2011). Conclusory statements, however, are not accepted as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007)). Logan refers to this proposed complaint as his "third amended complaint." In fact, it is his second amended complaint. As noted, this is the third time he is attempting to assert claims against the City defendants.

posed to students from unsupervised contact with non-instructional staff.

26. Regardless, despite the horrific facts of this case, and former Police Officer Lellock's conviction for sexual abuse, the Pittsburgh Public Schools have conducted no training on these policies and practices since before 1998 . . . until the present. One teacher who was deposed, Laura Devine, admitted as much, and further admitted that, today, she would continue to allow a school police officer to remove a child from her classroom with no authorization and no supervision. Ms. Devine was one of the teachers who, in 1998 and 1999, facilitated Lellock's sexual assault by failing to follow the policies of the Pittsburgh Public Schools.

39. The Plaintiff attaches to this Amended Complaint as Exhibit B, and incorporates by reference, the preliminary opinion of their expert, Marion McGrath, who details the national standards by which [s]chool [d]istricts should follow to avoid the sexual abuse of their students. Ms. McGrath further details her opinion that the Pittsburgh Public Schools failed to properly train their teachers about preventing the sexual abuse of students, including the need to "question and report the unauthorized removal of a child from their classrooms."

48. Had Pittsburgh Public School District adopted appropriate policies, procedures, and training regimens regarding the prevention of sexual abuse, Lellock would not have been able to victimize [Logan] . . . on so many occasions.

59. The Pittsburgh Public School District has failed to implement appropriate policies, procedures, and training regimens on a variety of subjects, including on recognizing signs of child abuse, and/or grooming activities. The Defendants also failed to implement appropriate policies, procedures, and training regimens addressing when employees were permitted to be alone with school children.

(*Id.* ¶¶ 24–26, 39, 48, 59).

In resolving this motion, the court may consider factual allegations contained in the proposed second amended complaint, authentic documents attached to or referred to in the

proposed second amended complaint, and public records.[5] *City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 259 (3d Cir. 1998). Logan attached to his motion a sexual-harassment-policy-training packet that was disseminated in the fall of 1992 by the City defendants. (ECF No. 59-13 at 1). The packet contained a 1986 non-discrimination and harassment policy that described how to respond to critical incidents, such as "assaults on students" or "use of poor judgement while interacting with students." (ECF No. 59-13 at 4–6). Logan also attached an August 2000 sexual harassment memo to his motion that stated "[d]uring the 1998-99 school year we provided a comprehensive training packet to supervisors, including a video which was to be shown to all staff." (ECF No. 59-17 at 1). The August 2000 packet contained written procedures and policies on sexual harassment with two pages dated "October 12, 1998" (*Id.* at 18–19). The other harassment policy pages were not dated, making it unclear whether they applied at the time Lellock sexually abused Logan. (*Id.* at 3–17). The court will not consider the 1986 and the 1998 harassment policies because they were not referred in or attached to the proposed amended complaint and are not within the Court of Appeals for the Third Circuit's definition of public records for the motion-to-dismiss stage. *W. Penn Power Co.*, 147 F.3d at 259.

The court may evaluate, as a public record, a Pennsylvania Superior Court decision, *Board of Public Education of the School District of Pittsburgh v. National Union Fire Insurance Co.*, 709 A.2d 910, 911 (Pa. Super. Ct. 1998), that recounted the sexual abuse of a child by a

---

[5] Public records include "criminal case dispositions such as convictions or mistrials, letter decisions of government agencies, and published reports of administrative bodies." *Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1197 (3d Cir. 1993) (internal citations omitted). The public has "unqualified access to" the above-listed documents. *Id.* Judicial opinions and preliminary hearing transcripts are also public records. *Sands v. McCormick*, 502 F.3d 263, 268 (3d Cir. 2007). Just because a document may be subject to disclosure under the Freedom of Information Act does not make it "a public record for purposes of a motion to dismiss." *White Consol. Indus.*, 998 F.2d at 1197.

District parent teacher organization member. *See Sands v. McCormick*, 502 F.3d 263, 268 (3d Cir. 2007). These harassment policies and the superior court decision do not address the removal of students from class by school police officers.

Attached to Logan's motion, but not to the proposed amended complaint, is District correspondence involving Lellock or referring generally to sexual harassment allegations or investigations. The correspondence included a 1991 letter mentioning Lellock's inability "to deal with the dynamics of a public school setting" (ECF No. 59-7); a 1995 memo seeking a sexual-harassment-complaint investigator (ECF No. 59-14); an October 1999 letter discussing that Lellock "stopped by Rooney Middle School" and should "refrain from making any visits there" because of "last year's incident" as well as not immediately transporting a truant student to the truancy center (ECF No. 59-10 at 1); and a November 1999 letter from the Pennsylvania Department of Education to District superintendent Dale Frederick describing a District teacher "soliciting students for sex" (ECF No. 59-16). The above correspondence was not attached to or described in the complaint; the court may not consider this evidence at the motion-to-dismiss stage. *W. Penn Power Co.*, 147 F.3d at 259. Some of these documents are dated after May 28, 1999, thus not implicating notice to the City defendants or the City defendants' knowledge that Lellock was engaging in conduct raising concerns of possible sexual abuse before the May 28, 1999 incident. The other documents predating May 28, 1999, do not describe circumstances which would have given the City defendants notice that Lellock or any other school police officer was engaging in sexually questionable conduct with a student.

Many allegations of strange behavior and sexual improprieties against students and District-affiliated individuals referred to by Fadzen in his deposition cannot be considered by the court because the court cannot infer that they occurred prior to May 28, 1999. These allegations

include Fadzen discovering District principal Bernard J. Komoroski in a dumpster at night looking through windows with binoculars to see kids using drugs or behaving inappropriately (ECF No. 59-1 at 20:16–21:15); a teacher at Sunnyside School "engaged in very heavy child pornography" (*Id.* at 56:10–16); a fifteen-year-old student, Brian Fouch, having sexual relations with a five-year-old child he was babysitting (*Id.* at 44:14–23); a sexual predator entering a District school during community time (similar to a school open house) (*Id.* at 40:6–42:8); District police recovering a disc marked "Kitty Porn" with child pornography on it at Minadeo school (*Id.* at 73:5–75:19); and a male student raping a female student at the Martin Luther King school (*Id.* at 98:3–99:5).

Finally, Fadzen mentioned two incidents in his deposition that occurred after the May 28, 1999 incident in which Lellock was discovered alone with a student. He noted that former Board member Ron Suber raped a child (*Id.* at 18:7–22); Logan's brief indicates that the rape occurred in 2001—two years after the May 28, 1999 incident. (ECF No. 60 at 10). The rape Suber committed, which did not entail removing a child from a classroom and occurred after his Board tenure ended (ECF No. 59-1 at 112:9–11), could not have given the City defendants notice that Lellock sexually abused Logan or any other student before May 28, 1999. Fadzen's testimony regarding the timing of the second incident, which allegedly occurred at the CAPA school, is confusing:

> A guard named Alfonso Roberts . . . unbeknownst to me had said that a teacher, and this would been within the last—the last four years, there's a guy in the school, he's taking kids in weird areas of the school. Plus, Lellock is taking them into the closet up on the second floor.

(*Id.* at 42:13–21). It is unclear whether the above excerpt means that Lellock took children into a closet at the CAPA school within the four years prior to Fadzen's deposition (March 28, 2012 through March 28, 2016) (*Id.* at 1) or if Alfonso Roberts learned within the four years prior to

Fadzen's deposition that Lellock took children into a closet at CAPA at an even earlier time. Either way, this evidence does not show that the City defendants had notice about Lellock or any other school police officer taking students into a closet before the May 28, 1999 incident. The court cannot infer the City defendants knew or had notice about Lellock's sexually questionable activities at CAPA before the May 28, 1999 incident.

## III. STANDARD OF REVIEW

Parties seeking leave to amend a complaint after the complaint-amending deadline established by a pretrial scheduling order must satisfy two Federal Rules of Civil Procedure. *Graham v. Progressive Direct Ins. Co.*, 271 F.R.D. 112, 118 (W.D. Pa. 2010). "'[A] party must, under Rule 16(b), demonstrate "good cause" for its failure to comply with the scheduling order before the trial court can consider, under Rule 15(a), the party's motion to amend its pleading.'" *Price v. Trans Union, LLC*, 737 F. Supp. 2d 276, 279 (E.D. Pa. 2010) (quoting *Chancellor v. Pottsgrove Sch. Dist.*, 501 F. Supp. 2d 695, 701 (E.D. Pa. 2007)). The United States Court of Appeals for the Third Circuit has not explicitly held that district courts should apply Rule 16(b)(4) before Rule 15(a)(2). *See Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 84 (3d Cir. 2010) (finding that the district judge did not abuse his discretion in denying a motion for leave to amend a complaint when he applied Rule 16(b)(4) before reaching Rule 15(a)(2)). Many of the other courts of appeals, however, have held that Rule 16(b)(4) should be applied before Rule 15(a)(2) when a party seeks leave to amend after a scheduling-order imposed deadline has passed and that "the Third Circuit would likely come to the same conclusion." *Chancellor*, 501 F. Supp. 2d at 701 (citing seven decisions of circuit courts of appeals in support). The same approach will be followed here.

Logan first must satisfy Rule 16(b)(4). It provides that "[a] schedule may be modified only for good cause and with the judge's consent." FED. R. CIV. P. 16(b)(4). "Good cause

requires a demonstration of due diligence." *Greygor v. Wexford Health Sources, Inc.*, No. 14-1254, 2016 WL 772740, at *2 (W.D. Pa. Feb. 27, 2016) (citing *Race Tires*, 614 F.3d at 84). "[I]f the party was not diligent, there is no good cause for modifying the scheduling order and allowing the party to file a motion to amend its pleading." *Chancellor*, 501 F. Supp. 2d at 701. If "the party knows or is in possession" at the outset of the litigation "of the information that is the basis for that party's later motion to amend," the party is presumptively not diligent. *Id.* at 702.

Second, Logan must satisfy Rule 15(a)(2). This rule provides that "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." FED. R. CIV. P. 15(a)(2). "This standard encompasses a broad range of equitable factors, including a party's delay in seeking leave to amend and any prejudice to the opposing party." *Arthur v. Maersk, Inc.*, 434 F.3d 196, 203 (3d Cir. 2006). "Only when these factors suggest that amendment would be "unjust" should the court deny leave." *Id.* These factors include "'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.'" *Lorenz v. CSX Corp.*, 1 F.3d 1406, 1413 (3d Cir. 1993) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

## IV. DISCUSSION

### A. Rule 16(b)(4) Analysis

Logan satisfied the good cause requirement to seek leave to amend his complaint after the scheduling order deadline passed because he obtained new evidence after he filed his first amended complaint on November 6, 2015. (ECF No. 42 at 15). The evidence forming the basis

of Logan's pending motion to amend came to light in Fadzen's March 2016 deposition. (ECF Nos. 59-1).

Based upon the evidence that emerged from the Fadzen deposition, Logan acted diligently in seeking leave to amend his complaint on May 9, 2016. (ECF No. 59). Rule 16(b)(4)'s good-cause standard is satisfied. *Greygor*, 2016 WL 772740, at *2 (citing *Race Tires*, 614 F.3d at 84).

### B.        Rule 15(a)(2) Analysis

Logan did not satisfy Rule 15(a)(2). Even if Logan received leave to amend his complaint, his proposed second amended complaint would not state a claim upon which relief can be granted. FED R. CIV. P. 12(b)(6). Thus, the court cannot grant the motion for leave to amend.

### 1.        Legal Standard

Rule 15 "does not permit amendment when it would be futile. Futility 'means that the complaint, as amended, would fail to state a claim upon which relief could be granted.'" *Kenny v. United States*, 489 F. App'x 628, 633 (3d Cir. 2012) (quoting *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 231 (3d Cir. 2011)). "The standard for deciding whether claims are futile for the purpose of granting leave to amend a complaint is the same as a motion to dismiss." *Markert*, 828 F. Supp. 2d at 771. "[I]f the court determines that plaintiff has had multiple opportunities to state a claim but has failed to do so, leave to amend may be denied." *See* CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1487 (2d ed. 2010).

A motion to dismiss tests the legal sufficiency of the complaint. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). In deciding a motion to dismiss, the court is not opining on whether the plaintiff will be likely to prevail on the merits; rather, when considering a motion to

dismiss, the court accepts as true all well-pled factual allegations in the complaint and views them in a light most favorable to the plaintiff. *U.S. Express Lines Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002). While a complaint does not need detailed factual allegations to survive a Rule 12(b)(6) motion to dismiss, a complaint must provide more than labels and conclusions. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007). A "formulaic recitation of the elements of a cause of action will not do." *Id.* (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 556. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully . . . . Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). Two working principles underlie *Twombly*. *Iqbal*, 556 U.S. at 667. First, with respect to mere conclusory statements, a court need not accept as true all the allegations contained in a complaint. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678 (citing *Twombly*, 550 U.S. at 555). Second, to survive a motion to dismiss, a claim must state a plausible claim for relief. *Iqbal*, 556 U.S. at 679 (citing *Twombly*, 550 U.S. at 556). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "But where the

well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* (quoting Fed. R. Civ. P. 8(a)(2)). A court considering a motion to dismiss may begin by identifying averments that are not entitled to the assumption of truth because they are mere conclusions. While legal conclusions can provide the complaint's framework, they must be supported by factual allegations. "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.

### 2. *Failure-to-Train Claims*

#### a. General Framework

"In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). Section 1983 failure-to-train claims raise "difficult problems of proof," *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 406 (1997), because they are "a step removed from the constitutional violation resulting from that failure." *Douglas v. Brookville Area Sch. Dist.*, 836 F. Supp. 2d 329, 364 (W.D. Pa. 2011); *see Okla. City v. Tuttle*, 471 U.S. 808, 822 (1985) (plurality opinion) ("[A] 'policy' of 'inadequate training' [is] far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*."). A local government's "culpability for a deprivation of [constitutional] rights is, therefore, at its most tenuous" where a § 1983 claim turns on a failure to train. *See Connick*, 563 U.S. at 61.

A municipality may be liable for the failure to train its employees "only where that failure amounts to '*deliberate indifference* to the [constitutional] rights of persons with whom the [employees] come in contact.'" *Doe v. Luzerne Cty.*, 660 F.3d 169, 179 (3d Cir. 2011) (quoting

*City of Canton v. Harris*, 489 U.S. 378, 388 (1989)) (emphasis added). To show deliberate indifference, Logan must prove two elements. First, "the risk of [the] injury [alleged] must be a 'highly predictable consequence' of the [municipality's] failure to provide . . . training." *Thomas v. Cumberland Cty.*, 749 F.3d 217, 225 (3d Cir. 2014) (quoting *Connick v. Thompson*, 563 U.S. 51, 64 (2011)). Second, Logan must "'prove that the deficiency in training actually caused [the constitutional violation at issue].'" *Doe*, 660 F.3d at 180 (quoting *Harris*, 489 U.S. at 391). "[T]he causation inquiry focuses on whether 'the injury [could] have been avoided had the employee been trained under a program that was not deficient in the identified respect.'" *Thomas*, 749 F.3d at 226 (quoting *Harris*, 489 U.S. at 391).

In *Harris*, the United States Supreme Court posited that even without a pattern of constitutional violations[6]

> it may happen that in light of the duties assigned to specific . . . employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.

*Harris*, 489 U.S. at 390. The Court provided a hypothetical of a "single-incident" claim (i.e. no pattern of known constitutional violations):

> For example, city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force . . . can be said to be "so obvious," that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights.

*Id.* at 390 n.10 (internal citation omitted).

---

[6] Here, the first incident which plausibly put the City defendants on notice about Lellock's constitutional violations occurred on May 28, 1999; Lellock's sexual abuse of Logan occurred prior to that time.

b. Failure to Train Staff in Preventing Police Officers from Improperly Removing Students from Classrooms Claim

Logan made several well-pled averments in his proposed second amended complaint regarding the District's failure to train staff members on policies preventing the improper removal of students from classrooms. In the motion-to-dismiss context, well-pled allegations in the complaint are taken as true and viewed in the light most favorable to the plaintiff. *Higgins*, 281 F.3d at 388. The complaint asserts that District police officers "were not allowed to remove students from a classroom unless they had a warrant or had authorization from the building principal." (ECF No. 59-19 ¶ 24). The District also "required a parent to be present during the interview" (likely referring to police officers interviewing students). (*Id.*). Interviews were to occur "in the office of the building principal or a guidance counselor." (*Id.*). Logan makes conclusory allegations that these policies were put in place "to preclude unsupervised or unmonitored encounters between students, non-instructional staff and/or visitors, in part to protect them from the risk of sexual abuse." (*Id.* ¶ 25). However, the District "conducted no training on these policies . . . since before 1998 . . . until the present." (*Id.* ¶ 26).

Describing the District's alleged policies in a complaint and alleging that no training about these policies occurred, however, is not enough for Logan's non-pattern claims to move forward. His complaint must be supported by sufficient facts for the court to plausibly infer that the City defendants were deliberately indifferent in not training their staff on the proper removal of students from classrooms and that not providing the training caused his injuries. To do this, Logan needed to aver facts from which the court could reasonably infer that the injuries Lellock inflicted on Logan were "a 'highly predictable consequence' of the failure to provide . . . training," *Thomas*, 749 F.3d at 225 (quoting *Connick*, 563 U.S. at 64), and "that the deficiency in

training actually caused [the constitutional violation at issue].'" *Doe*, 660 F.3d at 180 (quoting *Harris*, 489 U.S. at 391).

Here, Logan failed to include factual allegations in his proposed second amended complaint sufficient for the court to plausibly infer that the City defendants were deliberately indifferent to the need to train their staff on the proper removal of students from classrooms. There are no factual allegations that would permit this court to infer that the City defendants knew that the sexual abuse of a child by a school police officer would be a highly predictable consequence of not training the staff about the policy. *Harris*, 489 U.S. at 390 n.10. There is no basis to infer from the complaint that, at the time of Logan's abuse by Lellock, the City defendants had any notice or knowledge that Lellock, a District police officer, or any other District police officer, was a danger to students. The proposed second amended complaint does not point to any obvious risks that were brought to the City defendants' attention prior to the May 28, 1999 pertinent incident involving schoolchildren being removed by school police officers from classrooms. Logan's proposed failure-to-train claim is sufficient to plausibly infer negligence, but not deliberate indifference. In *Jankowski v. Lellock*, No. 13-194, 2014 WL 1017880 (W.D. Pa. Mar. 17, 2014), the district court concluded that sexual abuse of a student by a school police officer was not a highly predictable consequence of failing to train teachers about the proper circumstances for students to be released from their classrooms. In that case, the court held that

> [a] teacher's decision to permit school police officers to remove students from classrooms does not inherently threaten the students' welfare. There may be instances where a school police officer has a legitimate reason to take a student out of the classroom. Thus, it cannot be said that sexual abuse of students was the plainly obvious consequence of permitting school police officers to remove students from classrooms upon request.

*Jankowski*, 2014 WL 1017880, at *6 (citing *Douglas v. Brookville Area Sch. Dist.*, 836 F. Supp. 2d 329, 362 (W.D. Pa. 2011)). The plaintiff in *Jankowski* appealed and the Third Circuit Court of Appeals affirmed the district court's ruling that the plaintiff's failure-to-train claim was "merely a rote recitation of a cause of action coupled with a legal conclusion." *Jankowski v. Lellock*, 649 F. App'x 184, 188 (3d Cir. 2016). The court of appeals added in a footnote that "even if [the plaintiff] had shown a failure to train, he presents no facts suggesting such a failure would have been anything more than mere negligence" instead of deliberate indifference. *Id.* at 188 n.3.

While Logan avers that the existence of a policy regulating when school police could remove a child from a classroom "confirms that the Pittsburgh Public Schools were well aware of the risks of harm posed to students from unsupervised contact with non-instructional staff" (ECF No. 59-19 ¶ 25), the averment is a conclusory allegation that is not entitled to the assumption of truth in the motion-to-dismiss context. *Twombly*, 550 U.S. at 555. Absent the City defendants' knowledge or notice about Lellock's conduct or facts from which the court could infer that the City defendants knew at the time that Lellock's sexual abuse of Logan was a highly predictable consequence of a failure to train teachers about the proper circumstances in which District police officers may remove a child from a classroom, the City defendants could not be found deliberately indifferent as a matter of law.

In prior opinions in this case (*Logan* and *Logan II*), it was clear that there were no allegations that any teacher brought Lellock's removal of students from classrooms to the attention of any District administrator. The proposed second amended complaint (ECF No. 59-20) does not contain any factual allegation about the removal of Logan or other students that a District administrator became aware of prior to May 28, 1999. Logan, however, alleges in

his motion for leave to amend and his proposed second amended complaint (ECF Nos. 59 ¶ 3; 59-20 ¶ 30) that District employees were aware of an incident prior to May 28, 1999 in which Lellock inappropriately punished a child. No specific timeframe is given for this incident. Fadzen claimed that he was told about an incident at an elementary school during which Lellock allegedly handcuffed a child to a chair, sat on the child until the child's energy ran out, (*Id.* at 29:6–15), and seemed to seek sexual gratification by sitting on the child. (*Id.* at 33:10–14). Fadzen went to the school after the incident occurred when he had reason to believe Lellock would be there. (*Id.* at 29:22–25). Fadzen entered the school's office and observed Lellock sitting on the child. (*Id.* at 29:25–30:1). Lellock explained to Fadzen that he would "take all the fight out of the kid" after a principal or student aide called him. (*Id.* at 30:3–6). Fadzen complained to the then-superintendent and the director of human resources that Lellock was wrong to sit on the child, remarking "You guys ever hear about positional asphyxia? . . . You don't handle kids this way. You don't handle adults this way." (*Id.* at 30:7–19).

Lellock's method of sitting on a child to control his behavior is bizarre. It is reasonable to infer that a third party was present during the child's discipline because someone observed the discipline and gave an impression about it to Fadzen. (*Id.* at 29:6–15, 33:10–19). Fadzen expressed concerns that Lellock sitting on the child would suffocate him. (*Id.* at 30:7–19). He did not testify that Lellock's behavior constituted sexual abuse. (*Id.*). Later in his deposition, Fadzen admitted that he did not know until 2012 that Lellock sexually abused a child prior to May 28, 1999.[7] (*Id.* at 121:3–21). More importantly, Fadzen confirmed that he had no knowledge that any other District employee knew about Lellock's inappropriate sexual conduct

---

[7] The court may consider Fadzen's entire deposition in evaluating this motion because Logan attached the deposition as an exhibit to the proposed second amended complaint. *W. Penn Power Co.*, 147 F.3d at 259.

prior to May 28, 1999. (*Id.* at 122:5–24). Even if Rooney M.S. teachers or administrators had been aware that Lellock sat on a child in an elementary school as a form of discipline, that conduct would not be a reason for the District to know as a highly predictable consequence during the 1998-99 school year that allowing Lellock to remove Logan from classrooms would lead to Lellock taking Logan to a closed location to sexually abuse him.

There was one decision in which a plausible failure-to-train claim was found to be stated in a non-pattern situation. *L.R. v. Sch. Dist. of Phila.*, 60 F. Supp. 3d 584 (E.D. Pa. 2014), *aff'd*, 836 F.3d 235 (3d Cir. 2016). In *L.R.*, a teacher released a kindergartener from the classroom to a stranger who abducted and sexually abused the kindergartener. *Id.* at 586. The school district's policy, according to L.R., provided that

- only the "principal or his or her designee, the assistant principal, or the teacher-in-charge" was authorized to "grant a release" of students during the school day;

- any such release had to take place in the "school office"; and

- under "'no circumstances'" was a "'pre-kindergarten through Grade 8 pupil'" to be released without a "'properly identified adult'" or "'the adult's identification [being] checked against school records.'"

*Id.* at 587 (quoting L.R.'s complaint). L.R. alleged that by enacting the above policy, the school district acknowledged the likely risk of "'pupil abduction by unidentified individuals,'" yet failed to train its employees on that policy, causing the child's constitutional injury. *Id.* The district court agreed with L.R., concluding that L.R. stated a plausible failure-to-train claim. *Id.* at 600–01.

The *Logan* case is distinguishable from *L.R.* The most obvious difference between the cases is that the school policies in *L.R.* involved the abduction risk to young schoolchildren caused by strangers while the alleged school policies in *Logan* focus on when school police officers may remove students from classes. *Id.*; (ECF No. 59-19 ¶¶ 24–25). At the time of the

abuse of Logan, the District not knowing about the likely risk that a school police officer will sexually abuse a student in his custody was different than the risk of releasing a child to a stranger, who abducted and sexually assaulted the kindergarten-age student in *L.R.* *L.R.*, 60 F. Supp. 3d at 587; *see Jankowski*, 2014 WL 1017880 at *6 ("[a] teacher's decision to permit school police officers to remove students from classrooms does not inherently threaten the students' welfare."). Fadzen obliquely referred to school-visitation procedures in his deposition, but he did not testify that those procedures were applied at Rooney M.S. or that those procedures affected school police officers. Fadzen noted that he "was always in a full uniform" and acknowledged that people could readily identify him as a police officer. (ECF No. 59-1 at 139:18–140:5) ("Q: Everybody knew who you were? A. Yeah.").

Logan attached to his motion a purported District school visitor policy, but that policy does not include language from which this court could plausibly infer that it applied to school police officers entering District schools.[8] (ECF No. 59-11). The fact pattern and policy at issue in *L.R.* is distinguishable from this case because the risk of sexual abuse is far greater when a teacher allows a stranger to remove a child from a school than when, at the time of the abuse of Logan, a teacher released a middle school student from a classroom to a known school police officer. While the alleged facts may implicate negligence on the part of the City defendants, Logan did not aver sufficient facts for the court to reasonably infer that the City defendants were deliberately indifferent to his risk of being sexually abused while in Lellock's custody.

---

[8] In any event, the court is not able to review the purported school visitor policy at the motion-to-dismiss stage because it was not mentioned in the proposed second amended complaint, attached as an exhibit to the proposed second amended complaint, or alleged to be a public record. *W. Penn Power Co.*, 147 F.3d at 259.

c.     Failure to Train Staff to Detect and Report Signs of Sexual Abuse Claim

Logan's other proposed failure-to-train claim is that the City defendants' failure to train teachers to detect and report signs of sexual abuse was deliberately indifferent.  Logan must first demonstrate that "the risk of [the] injury [alleged] must be a 'highly predictable consequence' of the [municipality's] failure to provide . . . training." *Thomas*, 749 F.3d at 225 (quoting *Connick*, 563 U.S. at 64).  To do this, Logan in his proposed second amended complaint needed to aver facts from which the court could reasonably infer that the City defendants knew about and ignored the risk of sexual abuse of middle school students by individuals such as Lellock. *Logan*, 2016 WL 463787, at *10.  Logan's argument is that if the City defendants would have trained teachers how to detect and report sexual abuse of students, the teachers would have been able to detect and prevent sexual abuse from occurring at Rooney M.S.

Logan retained an expert to opine about the City defendants' compliance with national standards on training teachers to detect and report signs of sexual abuse.  Logan attached a report by that expert, Marion McGrath ("McGrath"), to his proposed second amended complaint as Exhibit B.  (ECF No. 59-20 ¶ 39).  McGrath detailed that "[i]n the 1990[]s there existed a national awareness that child abuse and sexual misconduct by school personnel was a severe problem."  (ECF No. 59-18 at 2).  Under Title IX guidelines, "school boards and school administrators needed to devise a clear plan . . . to communicate and train staff about child abuse and prevention of sexual misconduct of school personnel."  (*Id.*).  McGrath concluded that the administrators at Rooney M.S. "did not adequately provide staff development to train their teachers in sexual abuse of students by school personnel.  Had they done so, the school personnel would have known to question and report the unauthorized removal of a child from their classrooms."  (*Id.* at 5).  She also opined that the District "failed to comply with mandated safe

school measures to develop, implement, and train staff in processes and procedures required to foster a safe school climate free of sexual harassment and abuse of children." (*Id.*)

Logan's proposed second amended complaint stated some well-pleaded allegations regarding the City defendants' failure to train its staff in detecting and reporting sexually abused students. He stated that "the Pittsburgh Public Schools have conducted no training on . . . [sex abuse] policies and practices since before 1998 . . . until the present." (ECF No. 59-20 ¶ 26). Logan's teacher described Logan as "disruptive to other students, falling behind, and often absent," which is "conduct . . . consistent with an abused child." (*Id.* ¶ 45). "Nevertheless, the teachers . . . never asked Defendant Lellock any questions about why he was taking students from the classroom[] or where he was going." (*Id.* ¶ 46). Logan's teachers never questioned Logan "about what had transpired" when he returned to class. (*Id.* ¶ 19). These allegations may be sufficient to infer that the City defendants were negligent, but they are not sufficient for the court to reasonably infer that the City defendants knew that the risk of students being sexually abused by District police officers, such as Lellock, was likely or obvious. *Connick*, 563 U.S. at 64. Without factual allegations for the court to reasonably infer that, at the time Logan was being abused by Lellock, sexual abuse of students by a District police officer was a "'highly predictable consequence'" of the City defendants' failure to train staff to detect and report sexual abuse, the court is unable to conclude he has a plausible claim against the City defendants for deliberate indifference to his constitutional rights. *Thomas*, 749 F.3d at 225 (quoting *Connick*, 563 U.S. at 64).

## V. CONCLUSION

At the time Lellock abused Logan, the City defendants did not know or have notice that Lellock sexually abused students or took students to closed locations in sexually suspicious circumstances, like the May 28, 1999 incident. (ECF No. 59-1 at 173:25–174:6). The court is

unable to reasonably infer from the proposed second amended complaint that at the time of Logan's sexual abuse by a District police officer, that abuse was a "'highly predictable consequence'" of a failure to train. *Thomas*, 749 F.3d at 225 (quoting *Connick*, 563 U.S. at 64). It is tragic and deplorable that Logan was sexually abused by a person who was supposed to protect him from harm while attending school. While Logan's failure-to-train claims raise plausible claims for negligence by the City defendants, there are insufficient factual allegations to implicate a plausible claim against the City defendants for deliberate indifference to his constitutional rights. Neither of Logan's proposed failure-to-train claims survives Rule 12(b)(6) scrutiny. His factual averments are not sufficient for the court to reasonably infer that the sexual abuse he endured from Lellock was a highly predictable consequence of the City defendants' failure to train its staff about: (1) the proper circumstances in which District police officers may remove a child from class or (2) detecting and reporting sexual abuse occurring to schoolchildren.[9]

Although Logan showed the requisite diligence under Rule 16(b)(4) to amend his complaint after the deadline to do so passed, his second proposed amended complaint fails to state a claim upon which relief can be granted under Rule 12(b)(6). In this circumstance, Rule 15(a)(2) compels this court to deny Logan's motion for leave to amend his complaint (ECF No. 59).


Dated: March 15, 2017                                  /s/Joy Flowers Conti

                                                                        _____
                                                                        JOY FLOWERS CONTI
All Counsel of Record:                             Chief United States District Judge


---

[9] In light of this conclusion, the court will not revisit the issue of causation that was addressed in *Logan II*, 2016 WL 463787 at *11–12.